Annabelle **LIPSETT**, Plaintiff,
Appellant,

v.

**UNIVERSITY OF PUERTO RICO**, et
al., Defendants, Appellees.

No. 87–1931.

United States Court of Appeals,
First Circuit.

Oct. 26, 1988.

Charles S. Hey–Maestre with whom Jose Antonio Lugo and Judith Berkan, Santurce, P.R., were on brief, for plaintiff, appellant.

James D. Noel, III with whom Ledesma, Palou & Miranda, Hato Rey, P.R., were on brief, for defendants, appellees University of Puerto Rico, et al.

Wanda Rubianes–Collazo, Asst. U.S. Atty., and Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., on brief, for appellee Dr. Ernesto Rive–Mora.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This appeal arises out of an action for declaratory and injunctive relief and damages brought in the United States District Court for the District of Puerto Rico pursuant to the equal protection and due process clauses of the Constitution, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Title IX), 42 U.S.C. § 1983, the Constitution of Puerto Rico, and several Puerto Rico laws. Plaintiff-appellant, Annabelle Lipsett, claims that she was subjected to sex discrimination while she attended the General Surgery Residency Training Program at the University of Puerto Rico School of Medicine (Program). The district court granted summary judgment in favor of the defendants.

## THE CASE

The particular claims of the plaintiff were that she was sexually harassed while in the Program and that she was dismissed from the Program because of her sex. The defendant-appellees are: the University of Puerto Rico (University); Norman Maldonado, individually and in his capacity as Chancellor of the Medical Science Campus of the University; Pedro Juan Santiago Borrero, individually and in his capacity as Dean of the School of Medicine of the University; Gumersindo Blanco, individually and in his capacity as Director of the Department of Surgery and Chairman of the University of Puerto Rico and Affiliated Hospitals Residency Training Program; and Jose R. Gonzalez Inclan, individually and in his capacity as Acting Director of the Department of Surgery Residency Training Program; and Ernesto Rive Mora, individually and in his capacity as Director of the Training Program of the San Juan Veterans Administration Hospital. The district court granted summary judgment in favor of the University, Maldonado, Santiago, Gonzalez and Blanco in an opinion and order issued on June 12, 1986, *Lipsett v. Univ. of Puerto Rico*, 637 F.Supp. 789 (D.P.R.1986) (*Lipsett II*), and in favor of Rive in an opinion and order issued on September 16, 1987, *Lipsett v. Rive–Mora*, 669 F.Supp. 1188 (D.P.R.1987) (*Lipsett III*).[1] The latter order expressly incorporated the former one. *Lipsett III*, 669 F.Supp. at 1192. Plaintiff appeals from *Lipsett III*, challenging the grant of summary judgment in favor of the University, Maldonado, Santiago, Gonzalez, and Blanco (the state defendants) and Rive (the federal defendant).[2]

It is important to clarify the basis for the plaintiff's cause of action against each of the defendants. Plaintiff alleged that she was subjected to sex discrimination by the University through the actions of its agents, in violation of Title IX[3]; by Maldonado, Santiago, Gonzalez, and Blanco, in their individual and official capacities, in violation of 42 U.S.C. § 1983 (the equal

---

1. In *Lipsett v. Univ. of Puerto Rico*, 576 F.Supp. 1217 (D.P.R.1983) (*Lipsett I*), the district court denied a motion by Rive to dismiss based on sovereign immunity because the allegations against him could support a direct cause of action, pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. In an amended complaint of March 23, 1984, plaintiff named, in addition to the defendants listed above, Jaime Rivera Dueno, individually and in his capacity as the Secretary of the Department of Health of the Commonwealth of Puerto Rico; Charles S. Freeman, Center Director of the San Juan Veterans Administration; and Harry N. Walters, Director of the United States Veterans Administration. On August 30, 1983, the court dismissed the complaint as to Dueno. Plaintiff does not appeal this order. Neither does she appeal from the grant of summary judgment in *Lipsett III* in favor of Freeman and Walters. Nor does she appeal from

the grant of summary judgment in *Lipsett II* on the due process claim.

3. Title IX provides in relevant part:
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education ·program or activity receiving Federal financial assistance....

 20 U.S.C. § 1681(a). In *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that there is an implied private cause of action under Title IX. Such an implied right of action clearly extends to claims for declaratory and injunctive relief, although not necessarily for damages. *See, e.g., Lieberman v. University of Chicago*, 660 F.2d 1185 (7th Cir.1981) (Title IX does not provide a damages remedy to an alleged victim of sex discrimination).

protection clause);[4] and by Rive, in his individual and official capacities, in violation of the due process clause of the fifth amendment as well as of 42 U.S.C. § 1983 (the equal protection clause).[5] Because we find that the plaintiff has sustained her burden of showing that there is a genuine issue of material fact regarding her claims against all of these defendants, except for Dr. Maldonado, we reverse the grant of summary judgment in both *Lipsett II* and *Lipsett III.* We express no opinion, however, on whether the University is entitled to sovereign immunity as an instrumentality of the Commonwealth of Puerto Rico,[6] nor on whether the University is an "educational institution" receiving "federal financial assistance" within the meaning of Title IX.[7]

4. Section 1983 provides for a civil action, including damages, for the deprivation of rights by any "person" acting under the color of state law, custom, or usage. Officials of the University of Puerto Rico can be sued under section 1983 in their individual capacities. Whether they can be sued in their official capacities depends on whether the University itself can be considered a "person" under section 1983, a question which we need not decide for present purposes. *See, e.g., Gay Student Services v. Texas A & M University,* 612 F.2d 160 (5th Cir.1980) (state university and its officials, in their official capacities, can be sued as "persons" under section 1983); *Cannon v. University of Health Sciences/the Chicago Medical School,* 710 F.2d 351, 357 (7th Cir.1983) (assuming that state universities can be sued under section 1983). We also do not now decide the question of whether the University or its officials in their official capacities are immune from damages under the eleventh amendment. *See* footnote 5, *infra.*

5. Because Dr. Rive is a federal official (Director of the Training Program at the San Juan Veterans Administration Hospital), he can be sued in his individual capacity directly under the due process clause of the fifth amendment. *See Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). We need not decide today whether Dr. Rive is also a state actor who can be sued under section 1983, or whether he can be sued under the fifth amendment or section 1983 in his official capacity.

6. In a motion for dismissal filed on July 10, 1985, the University claimed that, as an arm of the Commonwealth of Puerto Rico, it was immune from suit under the eleventh amendment. The court never ruled on this motion, presumably because it granted summary judgment in favor of the University in *Lipsett II.* This court has previously held, in an action brought under section 1983, that:

> The extent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico and the fact that the Commonwealth appoints the governing body of the University convinces us that the University is sufficiently an "arm" of the state, ... to be immune from damages under the eleventh amendment.

*Perez v. Rodriguez Bou,* 575 F.2d 21, 25 (1st Cir.1978) (citations omitted). Other courts have similarly found that damages actions against state universities under section 1983 were barred by the eleventh amendment. *See Gay Student Services v. Texas A & M University,* 612 F.2d 160, 165 n. 5 (5th Cir.1980) (collecting cases). On the other hand, the Supreme Court has held that damages actions may be maintained under Title VII against a state, reasoning that Title VII's express authorization of damages actions against a state abrogates the eleventh amendment barrier. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Whether damages actions, if allowed at all under Title IX (*see* footnote 3, *supra*), may be constitutionally pursued against a state or arm of the state has yet to be decided. Title IX presents a different situation from Title VII, because there is in Title IX, unlike Title VII, no *express* congressional authorization of private damages actions. *See also WJM, Inc. v. Massachusetts Department of Public Welfare,* 840 F.2d 996, 1001–02 (1st Cir.1988) (discussing question of when Congress can abrogate eleventh amendment.) We thus venture no opinion at this time as to whether Title IX abrogates the eleventh amendment.

7. Title IX provides in relevant part:

> [A]n educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college or department.

20 U.S.C. § 1681(c). In *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the Supreme Court held that only the "program or activity" that actually received federal funds may be regulated under Title IX. In the Civil Rights Restoration Act of 1987, however, Congress overturned this aspect of the *Grove* decision by providing, in relevant part, that the term "program or activity" means

> *all* of the operations of ... a department, agency, special purpose district, or other instrumentality of a State or of a local government; or ... the entity of such State or local government that distributes such assistance and each such department or agency ... to which the assistance is extended, in the case of assistance to a State or local government....

## BACKGROUND

### The Atmosphere in the Program

The record in this case is quite large, comprising over seven thick volumes of motions, depositions, affidavits, and hospital documents. At the outset, we need to make clear a number of crucial points. First, we have reviewed every page carefully, viewing the material presented in the light most favorable to the plaintiff, the party before us who opposed summary judgment. *See Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169, 1171 (1st Cir.1988); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). We express no opinion, however, about the accuracy of the plaintiff's allegations nor their sufficiency in the face of conflicting testimony. Second, we draw this version of events primarily from the affidavit and deposition testimony of the plaintiff herself, and from the affidavit and deposition testimony of two supporting witnesses, Dr. Bensen and Dr. Mendez. Finally, we give in detail the plaintiff's description of the behavior of various men not named as defendants. We do this because it supports the plaintiff's position that the atmosphere in the Program was so charged with animus toward her and other women that it could be found that at least two of the named defendants, specifically Drs. Blanco and Gonzalez, were on constructive notice of this hostile atmosphere.

With these points of clarification in mind, we find that the following version of events could be found at trial.

The General Surgery Residency Training Program is a five-year program which integrates the surgical training programs of the San Juan Veterans Administration Hospital and the University Hospital under the direction of the Department of Surgery of the University. Trainees pass through three distinct levels of training: from assistant resident (first two years), to associate resident (second two years) to senior resident (last year). In addition, the faculty chooses one of the senior residents who has shown exceptional qualities of leadership, organization, maturity, and responsibility to serve as chief resident. He or she becomes the official representative of the resident staff in all departmental activities and is responsible for the implementation of departmental policy at the house staff level. The trainees perform under the guidance and supervision of the participating faculty and those residents who have reached a higher position in the five-year hierarchy. Competition in the Program can be intense, particularly during the first and second years when residents seek promotion to the limited number of second and third year positions. Those who make it to the third year are expected to finish all five years of the Program.

The plaintiff entered the Program as a first year resident in July 1980, after having completed her medical studies at the Caribbean School of Medicine in Cayey, a private college. For the first year and a half, she did very well. Her evaluation forms for work performed from July 1980 through September 1981 reflect ratings of "very satisfactory" and "satisfactory," with the great majority in the former category. Comments on the forms described the plaintiff as a "hard working resident who has done above average work," as one who "has an excellent fund of knowledge and is well motivated," and as one whose "discussions and presentation are excellent." And in May 1981, Dr. Gonzalez, then the acting director of the Program, informed the plaintiff and four other residents that they had been promoted to the second year, that they should expect to complete the Program, and that they should look forward to making family and living arrangements for this period.

In spite of these optimistic signs, however, the plaintiff was having trouble. In general, she claimed that the predominant professional view of surgery as a medical field appropriate only for men made it difficult, and at times impossible, for her to

Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, Sec. 3(a), § 908, 102 Stat. 28 (1988)

(emphasis added).

gain acceptance and respect in the Program. As specific indicators of this bias, she presented the following. First, the men in the Program dramatically outnumbered the women: in 1980, thirty-one men and four women; in 1981, thirty-four men and four women; and in 1982, thirty-one men and five women (including the plaintiff, who by this time, was appealing her discharge). In the past twenty-two years, sixty-eight men and five women completed the Program. Second, facilities for women were different from and inferior to those for men. The "on-call" rooms—the resting areas used by residents on the night shift—were divided into male and female sections. The room for the men, called "La Cueva," (the Cave) had a huge living room with a color television, a pool parlor, seats, a stove, a refrigerator, and a mural, and four private bedrooms; the room for the women, called "La Cuevita," had only a small ante-room with a sofa, a stove, and a refrigerator, and two semi-private rooms. At times, the telephone in this room was out of order, thereby making it difficult for women on duty to respond to medical calls.

Even more upsetting to the plaintiff than these deficiencies in the facilities were the attitudes she perceived of her co-workers and superiors. The chief resident during her first year, Dr. Marcelo Oben Martinez, made clear to the plaintiff that surgery was a male preserve not hospitable to women. He warned the plaintiff not to complain about this or any resultant problems that she might have, specifically holding out the case of Dr. Ana del C. Ruis Armendariz, a resident since dismissed from the Program, as an example of how administrators dealt with such complaints from women. According to the plaintiff, Dr. Oben also warned her that certain men, in particular a fourth year resident named Dr. Roberto Novoa Matthew, wanted to drive the plaintiff and all other women from the Program. When the plaintiff complained to Dr. Oben that the senior residents were not allowing her to operate as much as her

male co-workers, Dr. Oben tried to accommodate the plaintiff while she was in his service, but acknowledged that he could do nothing to end the differential treatment that she was experiencing in the service of other senior residents.

When the plaintiff worked under Dr. Novoa during this first year, Dr. Novoa was very explicit about his disdain for women. Specifically, he commented in her presence and before six male patients that he would like to have sex with a nurse who walked by. On another occasion, as the plaintiff was about to perform a sigmoidoscopy (a type of rectal examination), Dr. Novoa announced to the patient that the plaintiff was about to give that patient "pleasure." He justified his assigning plaintiff menial tasks by asserting that women should not be surgeons because they could not be relied upon while they were menstruating or, as he put it, "in heat." [8]

The second year of her residency, Dr. Novoa became chief resident. Upon assuming this position, Dr. Novoa declared publicly and to the plaintiff that he would "straighten out" the Program by instituting a "regime of terror," which would feature the goal of eliminating all women as residents. He warned the plaintiff that he intended to get rid of her just as he had driven out Dr. Ana Ruis. The fact that the plaintiff remained assertive in the face of such taunting irritated many of her male co-workers and superiors; they constantly instructed her to follow the example of another female resident, Dr. Maritza I. Homs Guilloty who obeyed their orders and prepared special food for them. One fourth year resident, Dr. Luis Morales Otero, told the plaintiff that women should not go into surgery because they needed too much time to bathe, to go to the bathroom, to apply makeup, and to get dressed. Throughout her second year, a number of residents warned the plaintiff that some men, including Dr. Novoa, continued with

---

**8.** We have taken the allegations in this paragraph from a December 1986 affidavit submitted by the plaintiff to the district court. Because there is no copy of this affidavit in the record, we have relied upon the district court's representation of these facts. *See Lipsett III,* 669 F.Supp. at 1197.

their threats to have her eliminated from the Program.

According to the plaintiff, harassment of her often took an explicitly sexual turn. The men plastered the walls of their rest facility with Playboy centerfolds. They composed a list containing sexually charged nicknames for all of the female residents, and posted that list on the bulletin board. The plaintiff's nickname, "Selastraga," translated literally to mean "she swallows them." They also posted on the wall a sexually explicit drawing of the plaintiff's body. Because the men's rest facility was the place where all residents received their meals, checked the bulletin board for notices, and met to discuss administrative and academic matters, the plaintiff (as well as the other female residents) were forced to confront these displays every day.

The only offers to alleviate the plaintiff's harassment came from residents who told her that if she had sexual relations with them, they would protect her throughout the residency. When the plaintiff was a first year resident, two of her superiors, Dr. Rehuel Rivera Montanez (third year), and Dr. Morales (fourth year), made continual remarks about her body and often moved so close to her that she had to tell them not to "bother" her. Both men also made repeated sexual advances, which, on each occasion, the plaintiff rejected.[9] Soon after it became clear that the plaintiff would not respond to their demands for sex, they became unfriendly and even hostile. Dr. Morales "made [her] life unbearable" when she rotated through his service; and Dr. Rivera insisted that she be taken off his service altogether. When the plaintiff complained to Dr. Oben, the chief resident, he explained that it was "characteristic" for a "low level woman resident to keep a relationship with a high level resident or an attending in order to ease her way through [the Program]."[10]

In plaintiff's view, Dr. Oben's observation takes on added significance in light of what plaintiff alleges concerning her experience with Dr. Rive, the director of the Program at the Veterans Administration Hospital during her rotation through the V.A. in November and December of her first year. She alleges that Dr. Rive made sexual advances to her and, when she was not receptive, retaliated against her. These allegations will be discussed further in our consideration of Dr. Rive's liability, see infra, pp. 912–913.

The plaintiff presented evidence tending to show that the harassment besetting her was not unique to her. Although no man had been discharged from the Program for reasons of disciplinary or personality problems for the ten years prior to June 1983, when the plaintiff filed her complaint, two women other than the plaintiff had been so discharged in the five years prior to that date. One of these women was Dr. Ana Ruis, the resident whom Dr. Novoa claimed to have driven out of the Program and whom Dr. Oben had held out as an example of what happened to women in the Program who complained.

The other woman was Dr. Karin Bensen. According to Dr. Bensen, her problems with male residents in the Program began even before she officially applied for admittance. When she rotated through the V.A. as a fourth year medical student she found that the atmosphere generated by the male residents was extremely hostile to women. Every day, and often many times each day, the residents tormented Dr. Bensen with the remark: "But you are a woman. You should not be a general surgeon." Certain of these men, including those who were married, bragged to her about their sexual exploits. They also rated women in front of her on the basis of physical attributes and sexual desirability. One man, Dr. Orlando S. Cuevas Soldevila, who was especially adamant that women did not belong

9. Another woman who was in the Program from 1978 through 1983, Dr. Zenaida Mendez Rivera, also claimed to have been sexually pressured by Dr. Rivera throughout her tenure. She asserted that he would often make his demands explicit, by conditioning his solving certain problems for her on her "going out" with him.

10. An "attending" is a fully trained doctor who is in charge of supervising the residents.

in surgery, threatened her at the end of her rotation at the V.A. by saying that if she ignored his warning and applied to the Program, he would do everything that he possibly could to see that she was thrown out.

Dr. Bensen later rotated through the University Hospital, where she also heard expressed a great deal of negativism about women going into surgery. Dr. Rivera would often lead a group of approximately eight residents in a "harangue" about how women should not be in surgery. His "bare tolerance" of Dr. Bensen left her with the strong impression that she was out of place.

Dr. Bensen entered the Program in July 1982. In August, she rotated with the plaintiff in the University Hospital. There she encountered a group of residents who not only resisted her presence, but resented her growing friendship with the plaintiff. These men, in particular Dr. Rivera, Dr. Cuevas, and Dr. Jose Cuyar Fernandez, warned Dr. Bensen that she would soon "start having trouble with [the plaintiff]" that she would "find out what [the plaintiff was] really like," and that she would suffer consequences if she and the plaintiff became friends. Eventually, the male residents began calling her "Selastraga, Part II."

Dr. Cuevas in particular seemed determined to carry out the threat that he issued earlier when he warned Dr. Bensen against applying to the Program. In February 1983, on the day before she began her rotation through the V.A. under the service of Dr. Cuevas, he told her that she would be "out of [there]" with the "first little mistake." Then, Dr. Bensen alleged, "[h]e spent the next three weeks making [her] life utterly impossible." At one point, Dr. Bensen was about to perform a difficult procedure which required that she cut between two ribs and literally push a piece of tube into the patient's chest. Dr. Cuevas took the tube away, remarking that "it [was] just as impossible for women to pass a chest tube as it [was for them] to pee

standing up." Dr. Cuevas' hostility toward Dr. Bensen eventually manifested itself in his negative evaluation of her at the end of this rotation. Dr. Bensen was dismissed from the Program in June 1983.

*The November Incident and its Aftermath*

The specific incident which eventually led to the discharge of the plaintiff occurred in November 1981, when the plaintiff was in her second year of the Program.[11] She had been assigned to rotate through the University Hospital under the supervision of Dr. Juan Ramirez Sanchez (fifth year) and Dr. Rivera (fourth year). On November 11, Dr. Rivera ordered her to do the work which, in plaintiff's view, was typically done by first year residents and only commanded of second year residents as punishment. When the plaintiff complained to Dr. Ramirez and Dr. Rivera, the two men responded that she had no right to complain and assigned her first year duties for thirty days. The plaintiff then appealed to Dr. Novoa. Dr. Novoa's answer was that Drs. Rivera and Ramirez were her seniors, and that if they told her to "lick the floor," she should "lick the floor." Dr. Novoa further ordered that, because she had resisted her superiors, she would be forced to do the work of a first year resident for the remainder of her second year (this would be until June 1983). A heated argument ensued, in which the plaintiff said that although she would work very hard, she would not allow him to "try to knock [her] off," nor would she remain "quiet and cry" as had Dr. Ruis. Dr. Novoa retorted: "We'll see about that, we'll see if you are not like Anita [Ruis]."

The entire incident took place in front of patients, and left plaintiff in such an upset state that she took refuge, crying, in the women's resting facility. There she tried to reach Dr. Gonzalez by telephone. She called his home twice; the second time, the woman who answered told the plaintiff that he was out and that she should try again. The plaintiff then went to her sis-

---

**11.** A year of residency runs from July of one calendar year through June of the next calendar year.

ter's house, a short distance away, where she finally contacted Dr. Gonzalez. After listening to the plaintiff's recounting of the incident, he advised her to go home and assured her that he would call the "boys" at the hospital to inform them that he had excused her from duty. He also promised the plaintiff that he would meet during the week with the residents involved to discuss what had happened.

The chronology of events immediately following the November incident are not entirely clear. At some point, the hospital staff, comprised of all fully trained physicians in the department of surgery, directed Drs. Gonzalez and Blanco to investigate the incident. Both men spoke with the plaintiff.

In her discussion with Dr. Gonzalez, the plaintiff explained that the residents involved in the November incident were harassing her by assigning her responsibilities appropriate for someone in the first year of the Program. In her discussion with Dr. Blanco, the plaintiff went even further. She described the Program's "dynamics"—namely the often expressed feeling among some male residents that women were unsuitable as surgeons. In particular, she described the level of animosity directed against her. She told him that she thought that this hostility was motivated in part by the fact that she was not the typically submissive woman. She went on to explain that some residents had made sexual advances to her, which she had refused, and that anger over this refusal could have been a factor engendering the hostility. She did not offer the names of these residents. Finally, the plaintiff strongly suggested that Dr. Blanco conduct an investigation to explore "what was going on at the residents['] level." She claimed that there was a "gap" between his perception of the residents' behavior and the reality of it. Part of the responsibility for the gap,

she implied, lay with several physicians who deliberately kept their knowledge of what was happening in the Program from the rest of the staff. As a result of the conversation, and apparently in response to the plaintiff's admission during it that she had once taken an overdose of tranquilizers, Dr. Blanco recommended that she see a psychiatrist who was a friend of his. He did not indicate that he would investigate her allegations.

After this incident, the conduct of Drs. Rivera, Ramirez and Novoa toward the plaintiff continued on course. They would neither talk to the plaintiff, nor allow her to operate, nor assign her any tasks. On December 2, Dr. Novoa called a residents' meeting to discuss the problems that he and Drs. Rivera and Ramirez were having with the plaintiff. Either on that day or the next, Dr. Novoa submitted a letter to Dr. Blanco, presumably from the entire staff of residents, alleging three incidents of misconduct by the plaintiff (including the one on November 11) and asserting generally that the plaintiff constituted a "grave disciplinary problem." [12]

At a meeting called on December 3, Drs. Gonzalez and Blanco reported that, although the plaintiff had committed a serious infraction of the code of behavior by leaving the hospital on November 11, "mitigating circumstances" existed for giving her "another chance." Dr. Blanco also presented the December 2 letter submitted by Dr. Novoa. The final decision reached by the staff (but not at the December 3 meeting) was that the plaintiff would be put on probation and transferred to the V.A. for six months, from January through June 1982. None of the residents involved in the November incident was punished.

The plaintiff's first evaluation from the V.A.—for the period of January through March 1982—reflected well above average work. Most of the ratings, in such catego-

---

**12.** On the bottom of the letter, in print different from that used in the letter itself, was a list of every resident in the Program, except of course, the plaintiff. The plaintiff alleged that the names listed merely indicated those in attendance at the meeting, but not those who endorsed the letter. She claimed that the names were put at the bottom of the letter to create the impression of a unanimous endorsement of its content. She also claimed that several of the alleged signatories informed her after the meeting that had the position asserted in the letter been brought to a vote, they would have refused to sign it.

ries as "professional knowledge," "ability to learn," "rapport with patients," and "interest in work," were "very satisfactory," and the lowest ratings, in the categories of "emotional maturity" and "adaptation to rules of institution," were "fairly satisfactory." In the section provided on the form for comments, there was the notation: "[She] [h]as performed at above average level. Because of previous disciplinary problems, she was placed on a six-month probationary period. At the end of these six months, a staff meeting will be called to see if she will be promoted to the third year of the residency." At some point in 1982, in all likelihood during this latter part of this second year, the plaintiff took her second surgical in-training exam, on which she achieved a percentile ranking of ninety-eight percent.

The plaintiff described her experience at the V.A. in less positive terms than was reflected in this evaluation of her work. She had particular problems with Dr. Juan O. Torres Cartagena, a third year resident at the time. When she once criticized Dr. Torres for treatment that he was administering a patient, he responded by punishing her (it is not stated how). The plaintiff responded by complaining to a staff physician, Dr. Hernan Mendez. The plaintiff also believed that Dr. Torres treated the first year male resident with whom she was working better than he treated her by assigning the male resident cases that, consistent with her more senior status, should have been assigned to her. The plaintiff complained about this unfairness to another staff physician, Dr. Calimono, who reacted by telling the plaintiff to "calm down" and "take things easy." Finally, the plaintiff experienced tension with Dr. Rive, who continued to focus his attentions on her. But, in contrast to her reaction during her first rotation through the V.A. in November and December 1980, during the second rotation she did not smile at him when he made comments about her appearance. Instead she gave him disapproving looks or turned away.

In June 1982, Dr. Gonzalez called the plaintiff to tell her that he was satisfied with her work, and therefore would recom-mended her for promotion to the third year. And on June 10, 1982, the staff made the promotion official. On July 1, however, on the very same day that the plaintiff signed her contract for the third year of her residency, the staff called her to a meeting to inform her that Drs. Cuevas and Torres, both third year residents who had supervised her work at the V.A., had filed separate complaints against her. Each complaint was dated June 24, 1982. Each accused the plaintiff of admitting patients to her particular ward without first consulting either the senior resident or the attending in charge of the ward. The complaint from Dr. Cuevas further accused the plaintiff of sowing "friction, arguments, discord and jealousy" among the residents. And the one from Dr. Torres further accused her of lateness and unauthorized absences, and of failing to inform her superiors of the results of analyses performed on patients whom she had been authorized to investigate. Both recommended that the plaintiff be discharged from the Program.

The plaintiff had neither seen these complaints nor even known of their existence; Dr. Rive, who was the director of the Program at the V.A., had sent them to the staff at the University Hospital without first discussing them with the plaintiff. She responded to them at the July 1 staff meeting as follows. First, she argued that the only precise charge leveled in the complaints—that she had admitted patients to her ward without permission—was a common practice engaged in by many residents in order to broaden one's exposure to interesting cases, and thereby gain as much experience as possible. In fact, she continued, when male residents engaged in the practice, it was viewed as an indication of enthusiasm and interest. Although she conceded that she had once or twice admitted patients to her ward when they were destined for another (the practice was called "stealing patients"), she claimed that these events were minor indiscretions, hardly the basis for discharge from the Program. Second, she asserted that the other accusations—of lateness, absenteeism, and general insubordination—were too

broad, vague and unclear to rebut properly, and she asked that Drs. Cuevas and Torres be brought before her, so that she could confront them directly to expose the untruthfulness of their charges. The staff refused her this opportunity.

Instead, after dismissing the plaintiff from the meeting, the staff heard Dr. Hernan Mendez, who commented that, although there had been significant improvement in Dr. Lipsett's performance, there had been a "recurrence of some of the previous problems" during the latter part of the probationary period. The staff decided to interview Drs. Cuevas and Torres, and then decide on final action at a staff meeting the following week.

At that staff meeting, called on July 8, Dr. Blanco reported that he had spoken with Dr. Cuevas, who had reasserted his position that "Dr. Lipsett should be separated from the service." The staff took his advice. They decided not to renew the plaintiff's contract for the 1983/1984 year, and to place her on probation for the 1982/1983 year, which time would allow her the opportunity to attempt to make arrangements for transferring to another program at the end of that year. But they conditioned the continuance of this probationary period on perfect behavior, noting that if "further proven allegations of misconduct [arose, the plaintiff] could be liable to [sic] immediate explusion." [13]

The plaintiff received the news of her dismissal in early August in a letter from Dr. Gonzalez dated July 15, 1982, and postmarked August 5, 1982. "As you know from previous talks with Dr. Blanco and myself," Dr. Gonzalez stated, "the reasons for this dismissal are purely disciplinary. Your academic performance has been consistently good." He went on to say that the first "disciplinary breach" occurring in November 1981 did not provoke a dismissal because the staff had recognized that the seriousness of this breach was "attenuated by evidence of harassment from other members of the House Staff." Instead, the plaintiff had been put on probation. He continued by observing that, although the staff knew of no complaints about her work when it voted to promote her to the third year on June 10, 1982, it had received complaints since then from two third year residents. In reliance upon these complaints, and after "long discussion," Dr. Gonzalez concluded, the staff decided to dismiss the plaintiff. He informed the plaintiff that she could appeal the decision.

The first stage of the appellate process took place on December 2, 1983, when the plaintiff sought a reconsideration of the July 8 vote before sixteen members of the staff.[14] At the start of the meeting, the plaintiff requested an extension of time to prepare her case, a request denied at the suggestion of Dr. Rive and then voted down thirteen to one. The plaintiff next read from her written proposal, in which she argued that

the facts occuring [sic] from the end of 1981 through the middle of the current year ... were nothing more than the culmination of the persecution and harassment which I was subjected to by a small group of my colleagues in the residency from the beginning of my training. Since this attitude came basically from my colleagues who were already in senior 'status' at that time in the residency, it had to be followed by other residents of lesser hierarchy. This situation reached such a degree that it became intolerable not only for me but also for the adequate functioning of the program.... I have previously stated and I reiterate now that many of the charges presented by some colleagues in

---

**13.** Those voting at the meeting included: Drs. Gonzalez, Blanco, Hernan Mendez, Rossello, Sorrentino, Vallecillo, Pasarell, Rodriguez, Lopez, and Novoa. It appears that Dr. Novoa had been promoted from chief resident to staff physician by this point. The vote was ten to one in favor of dismissing the plaintiff, with Dr. Rossello the lone dissenter. The information about what went on at the meetings, and who voted, is derived from minutes of the meetings, which are a part of the record.

**14.** In attendance at the meeting were the following: Drs. Blanco, Rodriguez, Lopez, Suarez, Philip Lowry, Rive, Lojo, Vallecillo, Defendini, Cerrud, Bernal, Novoa, Rossello, Gonzalez, Zenaida Mendez, and Marquez.

the aforementioned time frame have been false and lacking in evidence other than their own testimony; on other occasions the facts were altered and exaggerated.

In answers to questions from the staff at the conclusion of the reading, the plaintiff denied all of the charges leveled against her, characterizing them as part of a "general plot to malign her character." Because she placed significant responsibility for the development of these negative attitudes on Dr. Novoa, Dr. Novoa excused himself from the meeting. The plaintiff then described how Dr. Novoa had fostered a hostile atmosphere toward her from the very first day that she entered the Program. Once she left the room, the staff voted by a margin of ten to two, with three abstentions, to uphold the previous decision of the faculty.[15]

By letter dated December 9, 1982, Dr. Gonzalez informed the plaintiff of the staff's decision. He stated that she had another right of appeal to a committee outside of the department of surgery.

Plaintiff says that while she set in motion this last stage of the process, the harassment continued. Dr. Zenaida Mendez, who at this point was supervising the plaintiff directly, reported to Dr. Gonzalez that several residents were "picking on" the plaintiff by filing meritless complaints. Often the men took these complaints directly to Dr. Gonzalez, thereby bypassing discussion with Dr. Mendez himself, who, as the chief resident during this time, was supposed to receive the complaints first. Another woman in the Program, Dr. Bensen, testified in her deposition that Drs. Cuevas, Cuyar and Rivera, conspired almost daily to harass the plaintiff, many times informing Dr. Bensen of "how they were going to get rid of Dr. Lipsett and all her little friends."

The report of the staff at its meeting of March 10, 1983, was that the plaintiff continued to receive acceptable evaluations from the faculty for her knowledge and technical ability, but also continued "to create conflict among her peers." To buttress this accusation, three residents, Drs. Morales (fifth year), Luciano Puccio Hernandez (fourth year), and Manuel Mas Ramirez (third year), appeared before the meeting to present further complaints about the plaintiff. Upon investigating these complaints, however, Dr. Gonzalez determined that they were not serious enough to form the basis for immediate expulsion.

The appeals committee before which the plaintiff presented her final argument for repeal of the July 8 decision met initially on April 26, 1983. In attendance were Dr. Pedro J. Santiago Borrero, the dean of the medical school, Dr. Angel Espinosa, the director of the office of graduate medical education, Dr. Gonzalez, the chief of the department of surgery and director of the Program,[16] and Dr. Manuel Mas, the representative of the residents. Absent from the meeting, but also a member of the committee, was Dr. Efrain Rodriguez Vigil, the representative of the department of health. The plaintiff began her presentation by criticizing the committee for allowing Dr. Mas to be a part of it. Dr. Santiago responded that he had asked the residents to pick a representative from among the members of their group, and that because Dr. Mas was their choice, he would remain on the committee.

The plaintiff then read her appeal, which contained fifteen points covering three legal-sized pages. The highlights were as follows:

> [F]rom the beginning [of my participation in the Program], I was aware of the fact from conversations as well as from situations in which I found myself [that there was] a small group of residents ... who [would] devote themselves to harass[ing] me and obstruct[ing] my work for the sole purpose of having me expelled from the residency. This [was] due to my being a competent female resident since, as we all know, the surgery

---

15. We recognize that the total of these votes is fifteen, one vote short of the sixteen staff members listed in attendance at the meeting.

16. In December 1982, Dr. Gonzalez replaced Dr. Blanco and became director of the Program.

field has been practically forbidden to women until very recently. The situation reached such a degree that it became intolerable for me....

In regard to the accusatory briefs submitted by Drs. [Torres and Cuevas], ... I affirm that, to a great degree, they did not state the truth and the situations have been slanted.

Dr. Torres states that ... while under his supervision, I lied and took decisions without consulting the senior or attending. I affirm and will affirm that these allegations are incorrect.... In regard to the absences, I must explain that, while being at the Veterans' Hospital at that time, I was absent for three days following instructions from [name of physician], since he determined I was suffering from hepatitis.... I took a written note from the Hospital doctor to Dr. Jose R. Gonzalez Inclan and Dr. Rive Mora.

The plaintiff concluded by urging the staff to allow her to complete the Program, contending that she was "sure that once the colleagues who [were] masterminding all of this movement [had] left the residency, everything [would] return to normal."

Following the April 26 meeting, Dr. Santiago conducted two meetings, one with the faculty on April 28, and another with twenty-two of the residents on May 5. At the meeting with the faculty, Dr. Santiago asked Dr. Mas, who was present as a member of the appeals committee, whether he thought that the plaintiff was a victim of harassment or discrimination. Dr. Mas answered that "[t]here [was] no evidence [of that nature] whatsoever." He continued by commenting that "[a]mong the residents there [did] not exist the custom of having some residents [go] against another resident, and much less to request their separation from the program." At the meeting with the residents, Dr. Santiago repeated his inquiry. Two women, Dr. Lianis Bodot and Dr. Maritza Homs, stated that they had not noticed any evidence of harassment or sexual prejudice.

On May 13, 1983, the appeals committee met again and affirmed the July 8 decision.

In a memorandum summarizing the committee's findings, Dr. Santiago noted that although there were several other female residents in the Program, "no one [else] ha[d] complained about harassment, or discrimination due to sex." By letter dated May 16, 1983, Dr. Santiago notified the plaintiff that the appeals committee affirmed her discharge from the Program.

The plaintiff commenced the instant lawsuit soon thereafter, and now appeals from the orders of summary judgment issued in favor of the defendants.

## THE SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Federal Rule of Civil Procedure 56(c). As we recognized in *Hahn v. Sargent*, 523 F.2d at 464, the language of this rule "sets forth a bifurcated standard which the party opposing summary judgment must meet to defeat the motion. He [or she] must establish the existence of an issue of fact which is both 'genuine' and 'material.'"

In assessing whether a dispute is material, the district court must look to the substantive law of the case, for "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). And, in assessing whether the dispute is genuine, the court must review the evidence "through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513. In other words, "in a run-of-the-mill civil case," the court must ask "whether a fairminded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 252, 106 S.Ct. at 2512. The court must insist that the party opposing the motion not rest upon "mere allegations," Federal Rule of Civil Procedure 56(e), but go beyond the pleadings and by his or her

"own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(e)); *see also Daury v. Smith,* 842 F.2d 9, 11 (1st Cir.1988). But the court should do no more than this in reviewing the quality of the evidence. Most critically, it must never "weigh the evidence and determine the truth of the matter...." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Rather, as we have stated, the court should "'look at the record ... in the light most favorable to ... the party opposing ... the motion' ... [and] indulge all inferences favorable to the party opposing the motion." *Hahn,* 523 F.2d at 464 (quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)) (citations omitted). If, after this canvassing of the material presented, the district court finds that *some* genuine factual issue remains in the case, whose resolution one way or another *could* affect its outcome, the court must deny the motion. *See Anderson,* 477 U.S. 242, 106 S.Ct. 2505. And we, as the reviewing court, can reverse a grant of summary judgment if we find that "'issues of fact which were adequately raised before the district court need to be resolved before the legal issues in the case may be decided.'" *Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 934 (1st Cir.1987) (quoting *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983)). "Notwithstanding that recent caselaw has invited greater use of Rule 56, the test remains a fairly rigorous one." *Greenburg,* 835 F.2d at 934.

▮ Moreover, the test remains particularly rigorous when the disputed issue turns on a question of motive or intent. *See Poller,* 368 U.S. at 473, 82 S.Ct. at 491 ("summary judgment procedures should be used sparingly ... where motive and intent play leading roles"); *cf. Pullman–Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982) (whether a defendant's behavior reflected an intent to discriminate is a pure question of fact). "Under such circumstances, jury judgments about credibility are typically thought to be of special importance." *Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 928 (1st Cir. 1983). In a discriminatory discharge case, particularly, a plaintiff "will rarely, if ever be able to produce a 'smoking gun' that provides direct, subjective evidence of an employer's [animus]. Rather, a plaintiff must try to convince the fact-finder to draw an inference from a broad array of circumstantial and often conflicting evidence...." *Id.* at 929. Even in such cases, however, we will not refuse to affirm a grant of summary judgment in favor of the defendant if the plaintiff rests merely upon "unsupported allegations and speculations." *Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 110 (1st Cir.1988) (citation omitted) (race discrimination case). But when the plaintiff can point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus, the dispute must be subjected to the factfinding process.

## SEX DISCRIMINATION LAW

The plaintiff made two sex discrimination claims. First, she alleged that she was sexually harassed by several of her supervisors in the Program; second, she alleged that she was discharged from the Program on the basis of her sex.

In particular, the plaintiff alleged that she was subjected to sexual harassment by Dr. Rive, at the Veterans Administration Hospital, and by residents in the Program who are not named as defendants. The sexual harassment by Dr. Rive could give rise to a cause of action against him under the due process clause of the fifth amendment and possibly under section 1983, *see* footnote 5, *supra.* The sexual harassment by the residents could give rise to a cause of action against the University under Title IX. It could also give rise to a cause of action against Drs. Maldonado, Santiago, Blanco, and Gonzales under section 1983

for allegedly failing to supervise these residents adequately.

The plaintiff's claim that she was discharged from the Program on the basis of her sex is itself a two part allegation: that she was subjected to discriminatory treatment by those residents who filed complaints about her performance, and by the University and Drs. Maldonado, Santiago, Blanco and Gonzalez, who used these complaints as a basis for discharging her. This claim of discriminatory treatment could give rise to a cause of action under section 1983 against all of the above named defendants, and a cause of action under Title IX against the University.

We begin by setting forth the legal standards for evaluating each of these claims.

*Title VII, The Equal Protection Clause, and Title IX*

Our analysis is simplified by the fact that we can draw upon the substantial body of case law developed under Title VII[17] to assess the plaintiff's claims under both section 1983 (the equal protection clause) and Title IX.

■ Discrimination on the basis of sex violates the equal protection clause if such discrimination does not "serve important governmental objectives" and is not "substantially related to achievement of those objectives." *Davis v. Passman,* 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979). To prove a violation of the equal protection clause, a plaintiff must show that the defendant acted with discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976); *United States v. Massachusetts Maritime Academy,* 762 F.2d 142, 153 (1st Cir.1985); *White v. Vathally,* 732 F.2d 1037, 1039 (1st Cir.), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984). Because a showing of discriminatory intent is also necessary to make out a claim of disparate treatment under Title VII, "we have recognized that the analytical framework for proving discriminatory treatment [under Title VII] ...

is equally applicable to constitutional and Title VII claims." *White,* 732 F.2d at 1039. *See also Lewis v. University of Pittsburgh,* 725 F.2d 910, 915 n. 5 (3d Cir.1983) (holding that claims brought under sections 1981 and 1983 require the same elements of proof as a Title VII action), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984).

■ We never previously have addressed whether the Title VII standard for proving discriminatory treatment should apply as well to claims of sex discrimination arising under Title IX. In interpreting Title IX, the Supreme Court's only guidance is that it must be accorded "a sweep as broad as its language." *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982). Most Title IX cases to date only have raised questions about the jurisdictional basis of the statute —that is, whether a program receives federal financial assistance within the meaning of the statute, *see e.g., Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), or whether a program is exempt from the statute altogether. *See e.g., Mississippi University for Women v. Hogan,* 458 U.S. 718, 731–33, 102 S.Ct. 3331, 3339–40, 73 L.Ed.2d 1090 (1982). A few cases, however, have dealt with the question of what substantive standard to apply, assuming that the plaintiff can satisfy these jurisdictional prerequisites. The Tenth Circuit, for example, held explicitly in *Mabry v. State Bd. of Community Colleges and Occupational Educ.* that, "[b]ecause Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination," it would regard Title VII "as the most appropriate analogue when defining Title IX's substantive standards...." 813 F.2d 311, 316 n. 6 (10th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987). And, at least two other courts have implied that the standards governing claims arising under Title VII and Title IX were the same. *See O'Connor v. Peru State College,* 781 F.2d 632, 642 n. 8 (8th Cir.1986); *Nagel v. Avon*

---

**17.** Title VII of the Civil Rights Act of 1964 precludes employment discrimination on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e–2(a)(1).

*Bd. of Educ.*, 575 F.Supp. 105, 106 (D.Conn.1983).

We agree with this approach. The Tenth Circuit relied in *Mabry,* as we rely today, in large part upon the guideline of the Equal Employment Opportunity Commission (EEOC) entitled "Procedures for Complaints of Employment Discrimination Filed Against Recipients of Federal Financial Assistance." This guideline instructs agencies to "consider Title VII case law and EEOC Guidelines ... in determining whether a recipient of Federal financial assistance [under Title IX] has engaged in an unlawful employment practice." 28 C.F.R. § 42.604 (1987). *See* 1 A. Larson & L. Larson, *Employment Discrimination* § 7.45(b), at 2–241 (1987) (urging the courts to turn to the well-developed concepts of Title VII when deciding issues of employment discrimination under Title IX). We also rely upon the legislative history of Title IX itself, which strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII. The House Report provides in relevant part:

> One of the single most important pieces of legislation which has prompted the cause of equal employment opportunity is Title VII of the Civil Rights Act of 1964.... Title VII, however, specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision.

H.R.Rep. No. 554, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News 2462, 2512.

■ Both the EEOC guideline and the House Report referred to above deal with *employment-related* claims under Title IX. Similarly, our present holding—that the Title VII standard for proving discriminatory treatment should apply to claims of sex discrimination arising under Title IX—is limited to the context of employment discrimination. Plaintiff here was both an employee *and* a student in the program. In addition to receiving a salary, she was receiving training. We have no difficulty extending the Title VII standard to discrim-inatory treatment by a supervisor in this mixed employment-training context.

Having determined that the disparate treatment standard of Title VII applies as well to claims arising under the equal protection clause and Title IX, we now explicate those standards.

*Sexual Harassment*

■ Since 1976, when a federal court first held that sexual harassment was a form of sex discrimination actionable under Title VII, *see Williams v. Saxbe,* 413 F.Supp. 654 (D.D.C.1976), *rev'd on other grounds sub nom., Williams v. Bell,* 587 F.2d 1240 (D.C.Cir.1978), the courts have recognized that such harassment can take place in two related ways. The first, called "quid pro quo" harassment, occurs when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply. *See, e.g., Miller v. Bank of Am.,* 600 F.2d 211 (9th Cir.1979) (Title VII claim); *Barnes v. Costle,* 561 F.2d 983 (D.C.Cir.1977) (Title VII claim); *Alexander v. Yale University,* 459 F.Supp. 1 (D.Conn. 1977), *aff'd,* 631 F.2d 178 (2d Cir.1980) (Title IX claim). The second, called "hostile environment" harassment, occurs when one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of one sex that they alter the conditions of employment for them. *See, e.g., Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (Title VII claim); *Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986) (equal protection clause claim); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir. 1981) (Title VII claim). In essence, by creating a hostile environment, they force "a man or woman [to] run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living...." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2406 (quoting *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982)). But not all conduct that may be characterized as "harassment" rises to the level of an actionable claim; rather, it must be "sufficiently severe or pervasive 'to ... create an abusive working

environment.' " *Id.* (quoting *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971)). And finally, the determination of whether such an environment exists must be made by the trier of fact "in light of 'the record as a whole' and 'the totality of circumstances....' " *Id.* at 69, 106 S.Ct. at 2407 (quoting 29 C.F.R. § 1604.11(b)).[18]

To make out a prima facie case of quid pro quo harassment, under either the equal protection clause or Title IX, the plaintiff must show that (1) he or she was subject to unwelcome sexual advances by a supervisor or teacher and (2) that his or her reaction to these advances affected tangible aspects of his or her compensation, terms, conditions, or privileges of employment or educational training. *See Henson,* 682 F.2d at 909. In rebuttal, the defendant may show that the behavior complained of either did not take place or that it did not affect a tangible aspect of the plaintiff's employment or education. To make out a prima facie case of hostile environment harassment, the plaintiff must show that he or she was subjected to unwelcome sexual advances so "severe or pervasive" that it altered his or her working or educational environment. *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2406. And in response, the defendant may show that the events did not take place or that they were isolated or genuinely trivial. *See Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983).

■ The Supreme Court has directed that, in determining whether the behavior of a defendant constitutes sexual harassment, the fact finder must assess whether the advances (be they physical gestures or verbal expressions) were "unwelcome." *Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406. This holding leaves open the question of whose perspective—that of the harasser or that of the victim—should be used in assessing "unwelcomeness." The question is particularly important because often a determination of sexual harassment turns on whether it is found that the plaintiff misconstrued or overreacted to what the defendant claims were innocent or invited overtures. A male supervisor might believe, for example, that it is legitimate for him to tell a female subordinate that she has a "great figure" or "nice legs." The female subordinate, however, may find such comments offensive. Such a situation presents a dilemma for both the man and the woman: the man may not realize that his comments are offensive, and the woman may be fearful of criticizing her supervisor. We think, however, that both parties must make an effort to overcome this dilemma. The man must be sensitive to signals from the woman that his comments are unwelcome, and the woman, conversely, must take responsibility for making those signals clear. In some instances, a woman may have the responsibility for telling the man directly that his comments or conduct is unwelcome. In other instances, however, a woman's consistent failure to respond to suggestive comments or gestures may be sufficient to communicate that the man's conduct is unwelcome. Unless the fact finder keeps both the man's and the woman's perspective in mind, "defendants as well as the courts [will be] permitted to sustain ingrained notions of reasonable behavior fashioned by the offenders...." *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 626 (6th Cir.1986) (Keith, J., dissenting), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987).[19]

---

**18.** The EEOC guideline provides that

[i]n determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11(b) (1987).

**19.** Most reported harassment is of women by men. One recent report maintains that nearly fifty percent of working women and about fifteen percent of working men are sexually harassed on the job. *See* S.B. May, *Sexual Harassment Law in Massachusetts: Where We Stand and Where We Are Headed* 73 Mass.L.Rev. 60, 61 (1988) (citing B. Gutek, *Sex and the Workplace* 46 (1985)). *See generally* Note, *Sexual Harassment Claims of Abusive Work Environment Under Title VII,* 97 Harv.L.Rev. 1449 (1984).

*Discriminatory Discharge*

We have discussed the standard for proving a discriminatory discharge under Title VII extensively before, *see e.g., Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 70–71 (1st Cir.1984), *cert. denied,* 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1011–15 (1st Cir.1979), and will therefore only briefly summarize its salient points.

■■ Where direct evidence of discriminatory intent is lacking, a plaintiff may make out a prima facie case by showing: by a preponderance of the evidence, that (1) he or she is within a class protected by Title VII; (2) that he or she was performing his or her job at a level that met the employer's legitimate expectations; (3) that he or she was nevertheless fired; and (4) that the employer sought someone to perform the same work after he or she left. *See Loeb,* 600 F.2d at 1014. This burden is not "onerous," *Johnson,* 731 F.2d at 70 (citation omitted), and if met, shifts the burden of production to the defendant, who must then articulate a legitimate, nondiscriminatory reason for discharging the plaintiff. *See id.* (citations omitted). Once the defendant has done so, the plaintiff " 'must have an opportunity to demonstrate that the proferred reason was not the true reason for the employment decision,' " but was instead pretextual. *Id.* at 70–71 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)). The burden of persuasion on the ultimate issue of intent remains with the plaintiff at all times. *See Johnson,* 731 F.2d at 71; *see also Watson v. Fort Worth Bank and Trust,* —— U.S. ——, ——, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988) (discussing shifting burdens in Title VII disparate treatment cases).

This framework, which is essentially a method for ferreting out discriminatory animus where direct evidence of intent is lacking, is inapplicable when the plaintiff can prove discrimination by *direct* evidence. *See Trans World Airlines, Inc. v.*

*Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). In such cases, the plaintiff must prove by direct evidence that unlawful discrimination was a *motivating factor* in the employment decision. Then, the burden of persuasion (as well as production) shifts to the defendant, who must show "by a preponderance of the evidence that the same decision would have been made absent the discrimination." *Fields v. Clark University,* 817 F.2d 931, 937 (1st Cir.1987).

## LIABILITY OF THE INSTITUTION AND OF SUPERVISORS

In the previous section we discussed the sorts of conduct that may give rise to a cause of action for sexual harassment under Title IX and section 1983. An important feature of the present case is that the surgery residents who allegedly created an atmosphere of sexual harassment in the University of Puerto Rico surgery residency program are not themselves defendants. Rather the defendants are the University of Puerto Rico and certain supervisory officials. In this section, therefore, we discuss the circumstances under which (1) an institution may be held liable under Title IX for the sexually harassing conduct of its employees; and (2) supervisory officials may be held liable under section 1983 for the sexually harassing conduct of subordinates. We will first examine the standard of liability under Title IX, as it applies to the claims against the University itself. We will then examine the standard of liability under section 1983, as it applies to the claims against the supervisory officials.

1. *Liability of the Institution Under Title IX*

■■ In *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court discussed the liability of an institution for sexual harassment by its employees. Although the plaintiff in *Meritor* sued under Title VII, we apply the same analysis to sexual harassment claims under Title IX.[20]

**20.** In an order dated August 20, 1986, the dis- trict court rejected the plaintiff's Motion Re-

In *Meritor*, the Supreme Court rejected the contention that in cases of hostile environment harassment "employers are always automatically liable for sexual harassment by their supervisors." 477 U.S. at 72, 106 S.Ct. at 2408. But, the Court also "declin[ed] the parties' invitation to issue a definitive rule on employer liability," instructing instead that "Congress wanted courts to look to agency principles for guidance in this area." *Id.* The Court went on to qualify this holding by asserting that the "absence of notice to an employer does not necessarily insulate that employer from liability," and by rejecting the assertion that the "mere existence of a grievance procedure and a policy against discrimination,

coupled with the [plaintiff's] failure to invoke that procedure, must insulate [that employer] from liability." *Id.* (citation omitted).

The gist of the Court's holding is not to be gleaned from strict adherence to agency principles, which, as the Court noted, were to be mere "guidance," *Meritor*, 477 U.S. at 72, 106 S.Ct. at 2408,[21] but rather from its definitive refusal to find employers "always automatically liable." *Id.* We take this statement to mean exactly what it says: that employers are not always automatically liable. We also take it to mean its converse: that sometimes they *are* liable. Moreover, we think it significant that the Court defined the parameters of such

questing Reconsideration and Relief from the judgment issued on June 12, 1986. In that June 12 order, (*Lipsett II*), the court granted summary judgment in favor of the University, and Drs. Maldonado, Santiago, Blanco and Gonzalez. The motion requesting reconsideration was based partly on the fact that, seven days after issuing the June 12 order, on June 19, the Supreme Court announced its decision in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In that decision, the Court dealt, *inter alia*, with the scope of liability of an employer for the discriminatory acts of its employees. The district court rejected what it characterized as a belated attempt to rely upon the legal reasoning underpinning *Meritor*: "[p]laintiff has offered absolutely no justification for failing to include in her extensive oppositions to the motions for summary judgment an argument for the transposition of the Title VII supervisory-employee liability doctrine, available at the circuit court level way before the *Meritor* opinion was issued, to the particular factual and legal framework of this case." *See also Lipsett III*, 669 F.Supp. at 1191–92.

In fact, the plaintiff did discuss the Title VII supervisory-employee liability doctrine in her Brief in Opposition to Motions to Dismiss, dated September 1, 1983. In that brief, the plaintiff responded to the argument of Drs. Maldonado, Santiago, Blanco and Gonzalez that they must be dismissed because the plaintiff had pointed to no specific acts of sexual harassment committed by any of them. She argued that the "federal courts have recognized causes of action for sex discrimination based on claims of sexual harassment, whether such cases are grounded in Section 1983, Title VII or Title IX." (Citations omitted). Moreover, she asserted, [t]he courts have also recognized the liability of defendants other than those directly involved in the sexual harassment. A discriminatory environment may be found to exist, with liability for that environment extending

to individuals who are not individually involved in sexual harassment. Furthermore, where decisions are made to take some form of action against a victim of sexual harassment, liability of the decision-making officers may arise.

(Citations omitted). In support of these propositions, the plaintiff cited the following cases, *inter alia: Henson v. Dundee*, 682 F.2d 897 (11th Cir.1982); *Bundy v. Jackson*, 641 F.2d 934 (D.C. Cir.1981). Both of these cases arose under Title VII and both address the very question of the scope of employer liability that eventually was decided by *Meritor*. *Meritor*, in fact, was heard on a grant of certiorari from a decision issued by the District of Columbia Circuit, which itself drew extensively upon the reasoning of *Bundy*. *See Vinson v. Taylor*, 753 F.2d 141 (D.C.Cir. 1985). In short, the district court was in error when it asserted that the plaintiff had not, prior to June 1986, argued for the transposition of Title VII doctrine to her case.

21. Lower courts have followed the *Meritor* holding by adhering strictly to principles of agency. *See, e.g., Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir.1987); *Sparks v. Pilot Freight Carriers Inc.*, 830 F.2d 1554, 1558–60 (11th Cir.1987). References to agency principles, however, cannot be determinative. When a supervisor sexually harasses a subordinate, that supervisor is almost always "aided in accomplishing the tort by the existence of the agency relation," Restatement (Second) of Agency § 219(2)(d), whether or not he or she *expressly* threatens that subordinate by referring to the authority delegated. *Cf. Horn v. Duke Homes*, 755 F.2d 599, 605 (7th Cir.1985) (holding that the " 'company' is a legal form [which can] 'act' only through its duly-appointed agents"); *but see Sparks*, 830 F.2d at 1560 (finding determinative that the harasser specifically told the plaintiff that "he could fire her should she fail to comply with his advances") (footnote omitted).

liability by further holding that an employer could be liable *even* when the employee alleging hostile environment harassment fails to notify the employer of his or her complaint, and *even* when such an employee fails to invoke an existing grievance procedure to protest the alleged harassment. *Id.*

We therefore hold, following *Meritor,* that in a Title IX case, an educational institution is liable upon a finding of hostile environment sexual harassment perpetrated by its supervisors upon employees *if* an official representing that institution knew, or in the exercise of reasonable care, should have known, of the harassment's occurrence, *unless* that official can show that he or she took appropriate steps to halt it. *See Katz,* 709 F.2d at 256 (holding employer liable for hostile environment sexual harassment under Title VII if the "employer knew or should have known of the harassment, and took no effectual action to correct the situation"); *cf. Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1421 (7th Cir.1986) (holding employer liable for hostile environment racial harassment under section 1981 if management level employees "knew, or in the exercise of reasonable care should have known, about the campaign of harassment" and failed to take reasonable steps to prevent it). We further hold that this standard also applies to situations in which the hostile environment harassment is perpetrated by the plaintiff's coworkers. *See DeGrace v. Rumsfeld,* 614 F.2d 796, 804–05 (1st Cir. 1980) (finding that employer should be liable under Title VII for failing to take reasonable measures to stop co-workers from subjecting the plaintiff to racially charged misconduct).[22]

■ Finally, we note that *Meritor* explicitly dealt only with the standard of lia-

bility applicable to hostile environment claims. By referring with approval to the argument in the *amicus curiae* brief of the EEOC, it implicitly left intact the standard developed in the lower courts applicable to claims of quid pro quo sexual harassment and discriminatory discharges. Under this standard, an educational institution is absolutely liable for such acts "whether or not [it] knew, should have known, or approved of the supervisor's actions." *Meritor,* 477 U.S. at 70–71, 106 S.Ct. at 2408.

### 2. Liability of a Supervisor Under Section 1983

■ In implying a cause of action under Title IX, the Supreme Court has considered only actions against the educational institution itself. *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Accordingly, the separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX. If such a state official *directly* engaged in sexual harassment or sexual discrimination, he would, of course, be subject to section 1983 liability. In the present case, however, most if not all of the alleged acts of harassment and discrimination (with the exception of the alleged acts of Dr. Rive) were acts by surgery residents who are not themselves named defendants. The question before us, therefore, is to what extent the named defendants can be held responsible for the acts of others under section 1983 on account of their supervisory roles.

We had the opportunity to consider the standard of liability for supervisory officials under section 1983 in *Voutour v. Vitale,* 761 F.2d 812 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed. 2d 916 (1986).[23] We held that in order to

---

**22.** This aspect of our holding relies on the EEOC guideline on co-worker harassment, which provides in relevant part that

[w]ith respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the

conduct, unless it can show that it took immediate and appropriate corrective action.
29 C.F.R. § 1604.11(d) (1987).

**23.** In *Voutour v. Vitale,* we drew upon the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell,* the Supreme Court held that a *municipality* cannot be held liable solely because it employs a tortfeasor, but

hold the supervisory defendant in that case, a police chief, liable under section 1983, the plaintiff had to show that (1) "the conduct complained of was committed by a person acting under color of state law; and (2) [that] this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.* at 819 (citation omitted). The second inquiry, we went on to say, has "two distinct elements," namely whether there was a deprivation and whether the defendant's conduct *caused* this deprivation. *Id.* We concluded that the plaintiff could establish causation by showing a "pattern of police violence so striking as to allow an inference of supervisory encouragement, condonation, or even acquiescence," *id.* at 820 (footnote and citation omitted); or by showing "gross negligence [of the defendant] amounting to deliberate indifference...." *Id.* *See also Kibbe v. City of Springfield,* 777 F.2d 801 (1st Cir. 1985) (harm allegedly caused by policy of gross negligence in police training can meet standard of causation under 42 U.S.C. § 1983), *cert. dismissed,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987).

From this body of case law we conclude that a state official, sued under section 1983 in his or her official or individual capacity, can be held liable for the behavior of his or her subordinates if (1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was "affirmative[ly] link[ed]," *Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 2436, 85 L.Ed. 2d 791 (1985), to that behavior in the sense that it could be characterized as "supervisory encouragement, condonation, or acquiescence" *or* "gross negligence amounting to deliberate indifference." *See Bohen,* 799 F.2d at 1189 (entity may be liable under section 1983 for " 'informal actions ... which even tacitly [encourage] conduct depriving citizens of their constitutionally protected rights' ") (citation omitted). An important factor in making the determina-tion of liability is whether the official was put on some kind of notice of the alleged violations, for one cannot make a "deliberate" or "conscious" choice, *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 484, 106 S.Ct. 1292, 1300, 1301, 89 L.Ed.2d 452 (1986), to act or not to act unless confronted with a problem that requires the taking of affirmative steps. Once an official is so notified, either actually or constructively, it is reasonable to infer that the *failure* to take such steps, as well as the actual *taking* of them constitutes a choice "from among various alternatives." *Id.* at 483, 106 S.Ct. at 1300. One obvious "alternative" is to do something to make the violations stop. *See Guzman v. City of Cranston,* 812 F.2d 24, 26 (1st Cir.1987) (supervisory officials to be held liable under section 1983 when their action or inaction, including a failure to supervise that amounts to gross negligence or deliberate indifference, causes the constitutional violation) (citation omitted); *Miranda v. Munoz,* 770 F.2d 255, 260 (1st Cir.1985) (supervisory officials to be held liable under section 1983 on the basis of their own acts or omissions).

## THE STATE DEFENDANTS

The district court's grant of summary judgment in favor of the state defendants rested upon the court's finding that the plaintiff had failed to establish an " 'affirmative link' between those who participated personally in the alleged wrongdoing and the defendants who were not personally involved." *Lipsett II,* 637 F.Supp. at 800 (citation omitted). To establish such a "link," the court held, the plaintiff had to show that the University officials "somehow supported, acquiesced or encouraged the unruly residents' behavior by remaining impassive before complaints of such discriminatory and harassing conduct or by refusing to acknowledge and investigate a strikingly obvious pattern of sex discrimination and harassment ... or that such discriminatory treatment was part of a poli-

---

only if the municipality inflicts injury through the "execution of a ... policy or custom" that constitutes the "moving force of the constitutional violation...." *Id.* at 694, 98 S.Ct. at

2037–38. In *Voutour,* we applied a similar standard to determine the liability of a *supervisory official.*

cy sanctioned by them." *Id.* (citations omitted). Put another way, the court held, the plaintiff had to show that "the circumstances surrounding the 'affirmative link' of liability [revealed] gross negligence or deliberate indifference." *Id.*

The court held that the record did not support an inference that the University officials exhibited either gross negligence or deliberate indifference. First, it found that the material presented did not support the proposition that there was a "pervasive and oppressive atmosphere [of discrimination] that should have been apparent to [University] officials and moved them to take action." *Id.* at 802. Second, it found that officials of the University acted appropriately by initiating an investigation "[a]s soon as [they] were first placed on notice of [the plaintiff's] problems in the Program...." *Id.* Permeating the court's discussion was an implicit judgment that the plaintiff, "self-described as an outspoken woman," *id.* at 801, had exaggerated or fabricated altogether the events described in her complaint. The court noted that she made "limited approaches" to Drs. Blanco and Gonzalez, both of whom were "accessible." *Id.* at 802. And, continued the court,

> [d]espite plaintiff's failure to grant importance to the effect of this atmosphere on her studies by denouncing it with sufficient specificity and at the earliest possible time before [University] officials so that they could do something about it, she charges them for failing to perceive what she herself chose to disregard, although at the time there were means that she could have pursued.

*Id.*

We must reject the court's finding because we find that the record presents sufficient evidence from which it could be inferred that the University and individual defendants Drs. Blanco, Gonzalez, and Santiago, but not Dr. Maldonado, violated section 1983. First, the record could support a finding that the failure by Drs. Blanco and Gonzalez to investigate and put a stop to the harassment directed against the plaintiff constituted "gross negligence amounting to deliberate indifference." Second, it could result in a finding that the complaints directed against the plaintiff by the male residents were so infused with discriminatory bias as to render them pretextual, and that Drs. Blanco, Gonzalez, and Santiago had good reason to suspect this pretext, but nevertheless used these complaints as a basis for discharging her from the Program. Such use could be characterized as "supervisory encouragement and condonation of, or acquiescence in" the residents' discriminatory behavior.[24] We address each of these points in turn.

*The Sexual Harassment*

 The plaintiff argued that she was subjected to hostile environment and quid pro quo sexual harassment. She relied upon the following specifics: the barrage of commentary by such residents as Drs. Novoa, Morales, and Rivera that women in general, and the plaintiff in particular, should not be surgeons; the pointed threats made by Dr. Novoa to other residents and to the plaintiff herself that he would drive her out of the Program; the repeated and unwelcome sexual advances made to the plaintiff by Drs. Rivera and Morales; the hostile behavior directed against the plaintiff by these men once it became clear to them that she would not accede to their demands; the degrading pinups—including the Playboy centerfolds, the sexually explicit drawing of the plaintiff's body, and the list containing sexually charged nicknames of the female residents —plastered on the walls of the male residents' rest facility; and finally, the plaintiff's particular nickname, "Selastraga," which translated literally means, "she swallows them."

---

**24.** In the preceding section, we set forth the standard of liability applicable under Title IX—namely that of Title VII—as a guide to the court upon remand. In this section, we find that there is sufficient evidence in the record from which to infer that the behavior of Drs. Blanco, Gonzalez, and Santiago violated section 1983. Because the standard under section 1983 is more rigorous than that under Title IX, we assume, without discussing, that the record also supports an inference that the University violated Title IX through these men.

In addition to describing her own experiences, the plaintiff also documented the Program's bias against women: the disproportion of female to male residents completing the Program in the past twenty-two years and enrolled in the Program for each of the three years prior to the plaintiff's discharge. She also referred to admissible evidence that other women in the Program had been subjected to a sexually hostile environment. In particular, she pointed to the case of Dr. Ana Ruis, the resident whom Dr. Novoa claimed to have driven out of the Program, and whom another resident, Dr. Oben, held out threateningly to the plaintiff as an example of what happened to women in the Program who complained. The plaintiff also included the experience of Dr. Karin Bensen, who, in her own affidavit and deposition, described how she was similarly subjected to a barrage of anti-female commentary while she was a medical student rotating through the Program and, even more intensively, while she was a first year resident in the Program itself. Dr. Bensen named Drs. Cuevas, Rivera, and Cuyar, with Dr. Cuevas singled out in particular, as the primary perpetrators of this sexually hostile environment.

Finally, the plaintiff introduced the affidavit and deposition of Dr. Zenaida Mendez Rivera, who described how she was subjected to constant sexual pressure from Dr. Rivera. *See supra* at 887 n. 8. Dr. Mendez testified how the "female residents were practically obligated to go into the residents' room and [the male residents,] knowing it[,] . . . covered all of the walls of the room in public display with all of the women in poses—'Playboy.'" She claimed that this "decoration" subjected the women to "sexual humiliation" and "emotional distress" whenever they went to pick up their food or attend meetings.

The defendants offered little or no evidence disputing this array of allegations. They explained the disproportion of female to male residents by suggesting that few women chose to apply to the Program, specialize in surgery, or study medicine altogether. And they explained their failure to stop the sexual harassment directed against the plaintiff and other female residents by claiming to have known nothing of it.

The district court accepted the defendants' assertions in their entirety. First, the court concluded that the "disproportion [of female to male residents] [was] no clear sign that sex discrimination practices were rampant in the Program." *Lipsett II,* 637 F.Supp. at 797. Second, the court dismissed the plaintiff's claim that the cumulative effect of the specific incidents of sexual harassment created a hostile environment; it concluded that the plaintiff encountered problems with male residents because she lacked tact and not because these men harbored an anti-female animus toward her; and that neither the plaintiff nor Dr. Mendez could have been too troubled by the hostile atmosphere because they never complained to the staff about it. *Id.* at 797, 801–02. The court made no reference to the sexually degrading nickname given the plaintiff, nor to the sexually explicit drawing of the plaintiff's body. Nor did the court mention the allegations of the plaintiff that she was subjected to sexual harassment by Drs. Rivera and Morales, nor those of Dr. Bensen that she was subjected to an onslaught of anti-female taunting by male residents. And finally, the court reduced to one "incident" the allegations of Dr. Mendez that she was subjected throughout her five years in the Program to unwelcome sexual advances by Dr. Rivera.

The district court's conclusions are clearly findings on disputed issues of material fact. Although it is proper for a district court, when confronted with a motion for summary judgment, to ferret out undisputed issues of material fact, it is not within the court's province to make findings about disputed issues of material fact. By accepting the defendants' assertions in their entirety, the district court turned the summary judgment proceeding into a trial, and acted as a fact finder.

Although it is true that the disproportion of female to male residents was not a "clear sign," of sex discrimination in the Program, it was, in conjunction with the

other disputed issues, enough of an indication of such discrimination to withstand the motion for summary judgment. As the Supreme Court has recognized, evidence of the discriminatory impact of an institution's hiring or admissions practices may "be considered by the trial court in reaching a finding on whether there was ... discriminatory intent [by that institution] as a factual matter." *Pullman–Standard,* 456 U.S. at 289, 102 S.Ct. at 1790 (footnote citing *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978) for the proposition that "[p]roof that (an employer's) workforce ... contained a disproportionately high percentage of minorities is not wholly irrelevant on the issue of intent ... yet to be decided"). Here, the plaintiff introduced the statistical evidence not as definitive proof of discriminatory intent on the part of the defendants, but rather to buttress her claim that the evidence of hostility toward women in the Program was sufficiently obvious to put the defendants on constructive notice of it. Whether it was reasonable for the defendants to conclude that the low number of women in the Program resulted from this hostility or rather from the low number of women applying to the Program, or choosing to enter the field of surgery or the profession of medicine, is an issue of fact. And, even if it were true that a disproportionately low number of women applied, this finding alone would not dispose of the question of whether the defendants were aware of discriminatory practices in the Program, because the "dampening impact of [these practices] may undermine the relevance of figures relating to *actual* applicants." *Cannon,* 441 U.S. at 681 n. 2, 99 S.Ct. at 1949 n. 2 (emphasis in original) (citation omitted).

Moreover, it is a disputed issue of fact as to whether the male residents harassed the plaintiff because she lacked tact, or rather because she was a woman, or more precisely, a *woman* who lacked tact. The plaintiff made out a prima facie case of hostile environment harassment by specific allegations that Drs. Rivera and Morales subjected her to repeated and unwelcome sexual advances. *See Meritor,* 477 U.S. at 68, 106

S.Ct. at 2406. She buttressed this claim by pointing to the sexually explicit drawing of her body posted in the men's resting facility, *see Zabkowicz v. West Bend Co.,* 589 F.Supp. 780, 782–83 (E.D.Wis.1984), the sexually charged nicknames used to refer to the other female residents and herself, *see Katz,* 709 F.2d at 254, and the Playboy centerfolds displayed in an area where the residents congregated to take their meals and conduct meetings. *See Rabidue,* 805 F.2d at 627 (Keith, J., dissenting) (pointing out that the "presence of pin-ups and misogynous language ... can only evoke and confirm the debilitating norms by which women are primarily and contemptuously valued as objects of male sexual fantasy"). And finally, she introduced facts that could prove the existence of a hostile environment by showing that male residents subjected the plaintiff and other female residents to a constant verbal attack, one which challenged their capacity as women to be surgeons, and questioned the legitimacy of their being in the Program at all. This attack, although not explicitly *sexual,* was nonetheless charged with anti-female animus, and therefore could be found to have contributed significantly to the hostile environment. *See McKinney v. Dole,* 765 F.2d 1129, 1138–39 (D.C.Cir.1985) (holding that sexual harassment, to be illegal, "need not take the form of sexual advances or of other incidents with clearly sexual overtones"); *accord Hicks,* 833 F.2d at 1415. *See also Woerner v. Brzeczek,* 519 F.Supp. 517, 518–21 (N.D.Ill.1981) (finding that a series of actions, including belittlement of the plaintiff in front of her co-workers, repeated sexual advances, the interception of her mail and phone messages, and the harassment of co-workers who requested to work with her, constituted sex discrimination under section 1983).

The plaintiff also established a prima facie case of quid pro quo sexual harassment by Drs. Rivera and Morales. She claimed that each man implied that she should have sex with him, a demand made even more explicit by the warning issued by Dr. Oben, who told the plaintiff that it was "characteristic" for a "low level woman resident to

keep a relationship with a high level resident or an attending in order to ease her way through [the Program]." The plaintiff further alleged that once it became clear that she would not "keep a relationship" with either Dr. Rivera or Dr. Morales, they both became unfriendly and even hostile. This series of allegations portrays the very essence of quid pro quo harassment. *See Hicks*, 833 F.2d at 1414; *see also supra* at 897.

The crux of the district court's order, and the defendants' defense, was that the defendants knew nothing of the sexual harassment described above. The court discussed several "approaches" that the plaintiff made to Drs. Blanco and Gonzalez, but characterized them as "limited" and found that they were "insufficient to support the contention that [they] were aware that she was being sexually discriminated [sic] and harassed and that the program had a pervasive sexually oppressive atmosphere." *Lipsett II*, 637 F.Supp. at 802. Moreover, the court stated, the atmosphere of which the plaintiff complained was not so offensive as to put the defendants on constructive notice "that sex discriminatory attitudes, to the extent of [sic] affecting the female residents' performance and evaluations, existed in the Program." *Id.* These were findings of contested issues of material fact.

As suggested above, we find that there was sufficient evidence in the record from which it could be inferred that the atmosphere described by the plaintiff was so blatant as to put the defendants on constructive notice that sex discrimination permeated the Program. The most obvious example of the offensive atmosphere was the constant attack by male residents on the capabilities of the plaintiff and other female residents. It is reasonable to infer that Drs. Blanco and Gonzalez, director and acting director of the Program respectively, knew that this attack was taking place.[25] Dr. Gonzalez, in fact, admitted during his deposition that he heard residents and attendings make remarks to the effect that "women should not be general surgeons." He dismissed those remarks, he explained, because they were "not weighed in the decisions taken by the staff," and because they were made "more in jest than in reality."

Dr. Gonzalez' dismissal of these anti-female remarks as mere "jest" may demonstrate his insensitivity to them. Belittling comments about a person's ability to perform, on the basis of that person's sex, are not funny. As Dr. Mendez put it, when asked whether she felt that such "joking" was meant to demean her: "It really isn't comfortable when one is performing professional work and any person, whoever it may be, brings up the issue of sex as a [way of] questioning the capacity to perform the work...." Her observation suggests a clash of perspective. It *could* be that Dr. Gonzalez *thought* that the comments in question were mere "jest," but his reaction may reveal more about his role in allowing the hostile environment to continue than about whether the comments were "objectively innocuous." *Lipsett II*, 637 F.Supp. at 802.

But our disagreement with the district court rests upon more than our conclusion that, viewing the record in the light most favorable to the plaintiff, the defendants *should* have known of sex discrimination (and harassment) in the Program. There is also evidence in the record, which if be-

**25.** It is also reasonable to infer that Drs. Blanco and Gonzalez knew of the Playboy centerfolds pinned up in the men's rest facility. The facility was not a dormitory outside the confines of the hospital, but one used by all of the residents to post academic and administrative notices and to conduct meetings. Although it seems likely that one or both of these men—who were *directors* of the Program—would have entered the facility at some point and seen the centerfolds, Dr. Gonzalez in deposition claimed that he was not aware of them because "the times [he had] been there [he had] not seen them." Drs. Mendez and Bensen as well as the plaintiff claimed that the Playboy centerfolds were plastered all over the room. Moreover, the plaintiff submitted photographs of these centerfolds showing them posted in a room like that described as the men's rest facility. It is a disputed issue of fact therefore as to whether 1) the Playboy centerfolds were pinned up in the men's rest facility; and 2) whether Dr. Gonzalez' assertion that he was not aware of their existence was credible.

lieved, shows that Drs. Blanco and Gonzalez *actually* knew of it. In one of the two "approaches" recognized by the district court, occurring after the November incident, the plaintiff told Dr. Blanco of the Program's "dynamics"—the expressed hostility among some male residents toward the idea of women becoming surgeons. She also told him of the particular animosity directed against her, suggesting that this animosity was motivated by the fact that she was not the typically submissive woman. She further told him that she thought that the hostility of at least some residents was in retaliation for her refusal to succumb to their sexual advances. Finally, she advised Dr. Blanco to explore "what was going on at the residents['] level," informing him of a "gap" between his perception of the residents' behavior and the reality of it.

Dr. Gonzalez also learned of the Program's dynamics in the other "approach" initiated by the plaintiff after the November incident. In her explanation as to what happened during this incident, the plaintiff told Dr. Gonzalez that the residents were harassing her by assigning her responsibilities appropriate for a resident in the first year of the Program. Dr. Gonzalez appeared to understand and even accept this version of the events. In his July 1982 letter dismissing the plaintiff from the Program, he acknowledged that the seriousness of her disciplinary breach was "attenuated by evidence of harassment from other members of the House Staff." When asked during deposition what he meant by "harassment," he responded that "there was some type of behavior that made it uncomfortable and made her take all these actions that were inappropriate."

In spite of the plaintiff's allegations that she was being harassed by male residents in the Program, neither Dr. Blanco nor Dr. Gonzalez took any steps whatsoever to investigate those allegations. For example, when told by the plaintiff that Drs. Rivera, Sanchez, and Novoa were attempting to provoke her by assigning her duties appropriate for a first year resident, Dr. Gonzalez put the *plaintiff* on probation and took no disciplinary action against any of these men. Similarly, when told by the plaintiff that she was being sexually harassed by a number of male residents, Dr. Blanco not only put the plaintiff on probation and advised her to see a psychiatrist, but failed completely to follow through on her suggestion that he investigate "what was going on" among the residents.[26]

We think that these facts, which under summary judgment standards must be assumed as true, are sufficient to show that Drs. Blanco and Gonzalez knew of, but failed to investigate and put a stop to the sexual harassment directed against the plaintiff. And, it could be reasonable to infer that by so failing to act, Drs. Blanco and Gonzalez discredited the plaintiff and sent a message to the male offenders that they could continue to drive her and other women out of the Program with impunity.[27] Their inaction could be found to have "condoned," "acquiesced to," and even "encouraged" that unconstitutional behavior. It could be found to be "gross negligence amounting to deliberate indifference."

*The Discriminatory Discharge*

In the second part of her claim, the plaintiff alleged that the written complaints used as a basis for discharging her from the Program were infused with discriminatory bias. One complaint, presented to Dr. Blanco on or about December 3, 1981, grew out of the November incident; the others, two memoranda presented to

---

**26.** Dr. Blanco, however, did seem to recognize a problem. According to Dr. Mendez, he once commented during a staff meeting that life for women in the Program was made "intolerable," and that, as a result, almost all who began the Program did not finish. This acknowledgement of an "atmosphere of animosity" against women might be viewed as underscoring the egregiousness of Dr. Blanco's failure to take any steps to alleviate it.

**27.** Although the Program did have a policy against sex discrimination, it had no official grievance procedure to facilitate the airing of complaints about such discrimination in an atmosphere of trust and confidence. *Cf. Meritor,* 477 U.S. at 73, 106 S.Ct. at 2409 (finding that employer may escape liability under Title VII for hostile environment harassment if it has a grievance procedure "calculated to encourage victims of harassment to come forward").

the staff on or about June 24, 1982, evaluated the plaintiff's performance during her probationary period at the V.A.

The December 3, complaint asserted that the plaintiff constituted "a grave disciplinary problem which threat[ened] to undermine the morale of the residents and the adequate functioning of the residents and the ... [Program]." The specifics buttressing this conclusion were: 1) the November incident itself, in which the plaintiff "abandoned her stations while on duty;" 2) another incident, on November 27, 1981, in which the plaintiff again left the hospital without consulting anyone; and 3) the failure by the plaintiff to meet with an undetermined party to discuss the "situation."

In his complaint of June 1982, Dr. Cuevas accused the plaintiff of admitting patients to her ward without his permission, of overlooking instructions "to accomplish purely egotistical and personal goals," and of creating "friction, arguments, discord and jealousy." Dr. Torres also accused the plaintiff of admitting patients without permission. In addition, he asserted that the plaintiff often arrived late or not at all, and failed to inform her superiors of the results of analyses that she performed.

The plaintiff presented direct evidence of the discriminatory bias underlying two of the complaints described above by showing that two of the three men involved in the November incident, and one of the two men authoring the June complaints, harbored discriminatory animus towards women in general and the plaintiff in particular. These men were, respectively, Drs. Novoa, Rivera, and Cuevas.

The plaintiff described how Dr. Novoa boasted of his intentions to drive women out of the Program. In particular, she pointed out how he taunted her with threats that he would "get rid of her just as [he] had Dr. Ruis," another female resident who was discharged. The plaintiff also told of how Dr. Rivera made sexual advances to her, and, once refused, reacted by demanding that the plaintiff be taken off of his service. Dr. Mendez confirmed that Dr. Rivera exhibited extreme animus toward the plaintiff, causing her to characterize him as the "leader of the animosity against [her]." Dr. Mendez further commented that his reason for having the plaintiff taken off his service was rooted in discriminatory bias, and that he would have reacted "differently" had the plaintiff accepted his advances and become "intimate" with him. Finally, Dr. Bensen described Drs. Cuyar, Rivera and Cuevas as the "most strident" in the campaign against the plaintiff. "Openly in front of [Dr. Bensen] many, many times," they announced that "they were going to get rid of [the plaintiff] and all her little friends." "They were just absolutely determined," Dr. Bensen said, "to have [the plaintiff] thrown out." [28]

Dr. Bensen also pointed out that part of the residents' hostility stemmed from the realization that the plaintiff, a woman, was as competent as, and in some cases more competent than, many of the men in the Program. Dr. Rivera in particular resented the plaintiff because "he was extremely insecure of his own abilities and qualities." Moreover, Dr. Bensen continued, the plaintiff was assertive. She challenged the male residents openly by resisting their taunting and sometimes even criticizing their medical judgment. In so doing, she threatened to disrupt, as no other female resident did, the atmosphere of male dominance permeating the Program. The plaintiff herself confirmed that a number of male residents who were irritated by her assertiveness taunted her by insisting that she follow the example of Dr. Maritza Homs, a woman who always obeyed them and prepared special food for them.[29] Finally, Dr. Mendez stated that the hostility directed toward the plaintiff by Drs. Rivera and Morales was in a part a reaction not simply to her tactlessness, but to the fact

---

**28.** Dr. Cuevas was the particular resident whom Dr. Bensen claimed directed the most egregious sexual harassment against her.

**29.** It is interesting to note that Dr. Bensen claimed that Dr. Homs finally left the Program "voluntarily" because she could not endure the hostile, sexist atmosphere.

that such tactlessness came from a woman. When asked whether a male resident subordinate to Drs. Rivera and Morales would have been retaliated against if he had criticized them as did the plaintiff, Dr. Mendez replied that such a resident "would have been removed or punished in some way ... but it would never have reached the so serious situation of ruining his professional career...."

We agree with the conclusion of the Eleventh Circuit, which, when presented with a similar array of comments directed against a woman alleging constructive discharge, held that "it approaches the frivolous to contend that there was no direct evidence of sexual discrimination." *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1501 (11th Cir.1985). Similarly, we hold that the allegations that some male residents resented the plaintiff because she was assertive present direct evidence that these men were discriminating against her because she did not conform to their stereotype of the "good" (that is, the submissive) woman. *See Craik v. Minnesota State Univ. Bd.*, 731 F.2d 465, 481–84 (8th Cir.1984) (finding that female plaintiff might have been discriminated against because certain male co-workers and superiors resented her assertiveness and feminist viewpoints); *cf. Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir.1983) (refusal to hire a woman because of sex-stereotyped view of her physical abilities is invidious discrimination under Title VII); *Hopkins v. Price Waterhouse*, 825 F.2d 458, 465–72 (D.C.Cir.1987) (comments by partners about the plaintiff reflected stereotypical thinking that impermissibly infected her evaluation for promotion and helped to establish the liability of the employer under Title VII), *cert. granted,* — U.S. —, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988).

In addition to offering this direct evidence, the plaintiff also presented indirect evidence of the discriminatory bias underlying the complaints. First, she established that at the time of her discharge, she was performing academically at a level well above average. Second, she set forth enough of a rebuttal to the accusations of misconduct contained in the complaints to raise the inference that those accusations were either exaggerations or outright lies: (1) the November incident of leaving the hospital was justified by the fact that Drs. Novoa, Ramirez, and Rivera provoked her into leaving, and that Dr. Gonzalez gave her permission not to return to work; (2) except for this one incident, she left the hospital while on duty on only one other occasion, when she was unaware that Dr. Novoa was looking for her because the telephone in the women's rest facility was not working; (3) admitting patients without permission was a common practice engaged in (and competitively admired) by many residents as a strategy for broadening one's exposure to interesting cases; (4) she was never late nor absent without permission; and (5) she never failed to report the results of her analyses to superiors.

The plaintiff's explanation created a genuine dispute as to the accuracy and truthfulness of the complaints. Dr. Gonzalez himself recognized that Drs. Novoa, Ramirez, and Rivera had harassed her into leaving the hospital, and, because this harassment had so upset the plaintiff, he had given her permission not to return to work. Dr. Mendez confirmed that admitting patients without permission was a "very frequent" practice among the residents. And finally, whether the plaintiff left the hospital without permission on an occasion other than the November incident under circumstances that rendered her culpable is a question of fact. It is also a question of fact as to whether the plaintiff arrived late or not at all, or failed to report the results of her analyses to superiors.

If the plaintiff's version of the accusations were accepted, she could succeed in proving that the residents' justifications for recommending her discharge were pretexts for discrimination. She could also succeed in buttressing her claim that Drs. Blanco, Gonzalez, and Santiago relied upon complaints that they had good reason to suspect were pretextual. For she presented evidence that they knew of the circumstances surrounding the November incident, that they knew of the commonality of

the practice of admitting patients without permission, and, most important, that they knew that several of the male residents leveling the accusations had been harassing the plaintiff, and were therefore probably exaggerating, mischaracterizing, or even misrepresenting her performance.[30]

Yet it could be found that not one of these officials, at any point in time, investigated seriously and objectively the plaintiff's allegations of harassment. Both Drs. Gonzalez and Blanco recommended putting the plaintiff on probation, even after Dr. Gonzalez determined that her superiors had provoked her into leaving the hospital. Dr. Blanco failed to explore the allegations of the plaintiff that the Program was rampant with sex discrimination, including specifically, sexual harassment, and that she in particular was a victim of the discrimination and harassment. Dr. Santiago did conduct an inquiry in April and May of 1983, but the nature of that inquiry could substantiate the plaintiff's position that no official took her allegations seriously. At the faculty meeting on April 28, 1983, called by Dr. Santiago to discuss the plaintiff's appeal, Dr. Santiago asked a resident, Dr. Mas, who was present at the meeting as the representative of the residents, whether he thought that the plaintiff was a victim of harassment or discrimination. Dr. Mas replied in the negative. But it could be inferred that Dr. Mas' assessment was suspect, and further, that Dr. Santiago knew this, because Dr. Mas himself recently had filed a complaint against the plaintiff. Moreover, the plaintiff had objected before Dr. Santiago to Dr. Mas' participation on the committee. At a similar meeting with the residents on May 5, 1983, Dr. Santiago repeated his inquiry as to whether the plaintiff was the victim of discrimination. All replied in the negative, including at least two women. But it could reasonably be inferred that Dr. Santiago also knew that these responses were suspect; soliciting comments from residents

about the behavior of other residents with those residents present is clearly not the most effective method for ferreting out the truth.

The most striking evidence suggesting the pretextual nature of the residents' complaints, and the awareness by Drs. Blanco and Gonzalez of this pretext, is that both men learned of misconduct committed by male residents that was arguably as serious than that forming the basis of the plaintiff's discharge. The plaintiff, for example, told Drs. Blanco and Gonzalez that many male residents drank alcohol while on duty. She claimed that the custom of drinking was so established that the men jokingly referred to their afternoon sessions as the "liver round," and openly kept an array of mixers and drink preparations in their rest facility. Dr. Mendez confirmed that drinking by male residents was widespread. At one point, while she was chief resident, Dr. Mendez brought the drinking problem to the attention of the staff in the form of a letter containing general allegations. Dr. Gonzalez subsequently met with Dr. Mendez, at which time he informed her that "this [would be] a very serious investigation that would involve bringing specific complaints against everybody." As a result, he said, "she then wrote a letter ... retracting the complaints, and this was presented to the staff and accepted ... as a retraction of the complaints and, therefore, as a closure of that case." Dr. Mendez alleged that she was pressured into withdrawing her complaint.

Another allegation of misconduct brought by Dr. Mendez to the attention of Dr. Gonzalez was that Dr. Rivera had falsified a medical record in an attempt to create the impression that the plaintiff and Dr. Mendez had mishandled a case. Upon learning of this misconduct, Dr. Mendez claimed, Dr. Gonzalez just "smiled" as if to

---

**30.** The plaintiff alleged that Drs. Blanco and Gonzalez learned of this harassment as early as December 1981, when the plaintiff met with them to discuss the November incident. She claimed that they learned of it again, in December 1982, when she presented the staff with her

petition for reconsideration. And finally, she alleged that Drs. Gonzalez and Santiago learned of what the plaintiff more pointedly characterized as *sexual* harassment in May 1983 when she presented her final appeal to the committee of which these two were members.

convey the expression: "Oh, that Rehuel [Rivera]." Dr. Mendez also alleged that Dr. Rivera and a number of other residents challenged her authority as chief resident by bringing complaints about the plaintiff directly to Dr. Gonzalez instead of first lodging them with her. The resolution by Dr. Gonzalez of what he characterized as "a situation in which the surgical residency was paralyzed" was to strip Dr. Mendez of most of her power. He allowed her to retain the salary and administrative duties of the chief resident, but deprived her of any authority over others. He called the move "posturing." [31]

Drs. Blanco, Gonzalez, and Santiago were far from new to the process of supervising residents. As experienced physicians and teachers, they understood that tensions and animosities, many of them bred by the competitive atmosphere of the Program, often caused personality conflicts among the residents. Their conclusion seems to have been that in the case of the plaintiff, this conflict had gotten out of hand, because the plaintiff simply could not get along with her co-workers and superiors. They may have been right that the plaintiff could not get along with a number of her co-workers and superiors. And they also may have been right that discharging the plaintiff was the easiest way to resolve the conflict. But, as one court noted under circumstances strikingly similar to the case at bar, "[w]here a woman is frustrated in her attempts to work cooperatively by the sexist attitudes and actions of her male co-workers, she is a victim of discrimination [and] [h]er dismissal, even where the work environment has degenerated completely, [is] in violation of Title VII." *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir. 1984); *see also Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1231 (7th Cir.1986) (upholding the district court's finding that although the plaintiff was not a "perfect employee," "any personality conflict which arguably developed was created by the overt hostility and scurrilous behavior manifested by [the defendant]"). Here, it would be reasonable to infer that by relying upon complaints that they had good reason to suspect were infused with discriminatory bias, Drs. Blanco, Gonzalez, and Santiago succumbed to the "sexist attitudes and actions" of certain male residents whom the plaintiff alleged had engendered such complaints in an effort to drive her from the Program. Their reliance could be characterized as an act of complicity amounting to the "supervisory encouragement or condonation of or acquiescence in" the residents' discriminatory behavior. *See id.* at 1231 (upholding the district court's finding that employer's discharge of the plaintiff in reliance upon an obviously pretextual report rendered employer liable under Title VII); *Hopkins*, 825 F.2d at 464 (upholding the district court's finding of liability against employer under Title VII because the employer "fil-

---

**31.** In addition to the failure by Drs. Blanco and Gonzalez to investigate these very serious allegations of misconduct by male residents, there was other evidence in the record suggesting the preferential treatment of male residents. For example, the plaintiff alleged that the facilities for women were inferior to those for the men. The defendants justified their failure to correct the inequities by claiming that certain aspects of these inequities were never brought to their attention, and that, in any event, the facilities were under the control of the Department of Health of the Commonwealth of Puerto Rico (DOH). But it is inaccurate to assert, as the district court did, that there was "no indication" that the inequities between male and female facilities were ever brought to the attention of any of the defendants. *Lipsett II,* 637 F.Supp. at 797. As the district court pointed out in a footnote following this very assertion: "Dr. Karin Bensen said that she discussed [one aspect of the inequities—the malfunctioning telephone] with Chief Resident Zenaida Mendez and that Dr. Mendez told her she had 'reported' the phone many times...." *Id.* at 797 n. 10.

The fact that both women failed to indicate "to whom they reported" does not eliminate their allegation. It is for the fact finder to determine whether this allegation is true, and if so, whether the allegation, when added to what the plaintiff claimed were obvious signs of differential treatment (*e.g.,* the color television and pool table in the men's facility), put the defendants on sufficient notice of the inequities. Similarly it is a disputed issue of fact as to whether the facilities were under the complete control of DOH. Dr. Gonzalez admitted in deposition that although DOH retained the ultimate authority to determine the Program's expenditures, the medical staff had the power to recommend budgetary increases.

ter[ed] [the plaintiff's] partnership candidacy through a system that gave great weight to negative comments and recommendations, despite evidence that those comments reflected unconscious sexual stereotyping"); *cf. Easter v. Jeep Corp.*, 750 F.2d 520, 523 (6th Cir.1984) (upholding the district court's finding that the management's indifference to and toleration of a sexually harassing environment, which environment led to the plaintiff's constructive discharge, violated Title VII).

## DR. RIVE MORA

 The district court's grant of summary judgment in favor of Dr. Rive rested upon the court's finding that the plaintiff failed to make out a prima facie case of quid pro quo or hostile environment sexual harassment against Dr. Rive. Because we find that the plaintiff made out a prima facie case of quid pro quo harassment, we only address the court's reasoning on this point.[32]

The court found that

[n]either one of the two core elements for the quid pro quo modality of harassment, demands for sexual favors and conditioning of job benefits upon submission to sexual favors, were shown to have been present in Dr. Rive–Mora's conduct.... Plaintiff never established that Dr. Rive–Mora demanded, explicitly or implicitly, that she submit to sexual acts.... Furthermore, ... the conditioning of a "job," in this case, of an educational benefit, to the sexual demand also has no factual support.

*Lipsett III,* 669 F.Supp. at 1200, 1201. We do not agree.

To begin, we restate the standard applicable for making out a claim of quid pro quo harassment: the plaintiff must show that (1) he or she was subject to unwelcome sexual advances by a supervisor or teacher and (2) that his or her reaction to those advances affected tangible aspects of his or

her compensation, terms, conditions, or privileges of employment or educational training.

The plaintiff described how, during her first rotation through the V.A. in November and December 1981, Dr. Rive directed to her what she perceived as sexual attention. Plaintiff had heard that Dr. Rive liked to pick the tallest and best looking women in the Program to rotate through his service. In short, the plaintiff had heard that Dr. Rive was a "womanizer." Shortly after the plaintiff started her rotation, Dr. Rive turned his attentions on her. For example, he would frequently remark to the plaintiff that she had an extraordinary body. Sometimes he simply called her "Bo Derek."

One night the plaintiff met Dr. Rive in the hospital parking lot and, according to the plaintiff, the following conversation took place. Dr. Rive remarked that the plaintiff did not seem to be operating very much. When the plaintiff explained to him that Dr. Novoa, her supervising resident during this V.A. rotation, had assigned her "floor duty," Dr. Rive responded: "No, but that cannot be like that, you have to operate with me." Then, after assuring the plaintiff that he would see to it that she operated on the cases of her choice, he made allusions to her body, particularly her legs and her hair, and asked the plaintiff whether she would like to go to drink something with him and talk for a while. The plaintiff refused.

Also, on an occasion when the plaintiff and Dr. Rive were operating together, he observed to her that instead of listening during surgery to the music piping into the operating room, he would prefer to hear that music while alone with her on a beach. He often visited the hospital on nights when she was on duty—asking the plaintiff if she felt lonely and whether she would like to meet with him in the emergency ward or the hospital lobby. On two occasions, nurses who worked in the V.A.

**32.** Although it is clear that the plaintiff can sue Dr. Rive directly under the fifth amendment pursuant to *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), it is less clear that she can sue him in his individual and

official capacities under 42 U.S.C. § 1983 on the ground that his connections with the Program effectively rendered him a state actor. We assume that she can, without deciding the question.

taunted the plaintiff with comments about Dr. Rive's behavior toward her. The head nurse of the surgery intensive care unit made fun of plaintiff's heavy legs, because, so plaintiff claimed, the nurse knew that Dr. Rive was "googy-eyed" with them and "wanted [the plaintiff] sexually."

The plaintiff claimed to have " 'sensed' " that the comments by Dr. Rive were demands that she submit to sexual acts. *Lipsett III*, 669 F.Supp. at 1200. But the court held that to have made out the "contours of a judicially cognizable quid pro quo claim," the plaintiff would have had to present "[a]dditional facts showing that these casual approaches led to some sexual encounter between them...." *Id.* The court in effect required that the plaintiff show that she succumbed to the very advances that she claimed to have been resisting in order to prove that Dr. Rive made such sexual demands at all. Without this proof, the court stated, the plaintiff's assertions were unworthy of credence, a mere "sense" or perception only "in [her] mind." *Id.*

This holding is untenable. The gist of a quid pro quo claim is that the plaintiff is threatened by the harasser with demands for a sexual encounter. If the plaintiff rejects those demands, then the threats may become real—that is, he or she may lose a job or educational benefit for failing to comply. Conversely, the plaintiff may accede to those demands out of fear that the failure to do so will unleash the very retaliatory behavior threatened. He or she may then be rewarded for this compliance. If the plaintiff is threatened, and if the plaintiff is rewarded or punished, then there is quid pro quo harassment. It does not matter, for purposes of making out such a claim of sex harassment, whether the plaintiff actually had a sexual encounter with the harasser. And if she does have such an encounter, her "capitulation to ... sexual advances cannot work a forfeiture of her opportunity for redress." *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir.1985), *aff'd Meritor Savings Bank,*

*FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

Here, the plaintiff's perceptions were that she was being threatened with demands from Dr. Rive. Whether under the circumstances she reasonably viewed these comments as implicit demands for a sexual encounter is a question of fact. *See Meritor,* 477 U.S. at 68, 106 S.Ct. at 2406. Although the evidence of Dr. Rive's conduct is ambiguous, we think a reasonable jury could infer that he pressured her for sexual favors in return for assistance in the Program. Therefore, it was error for the district court to rule, as a matter of law, that the comments were so clearly innocuous as to justify granting summary judgment in favor of Dr. Rive.

The plaintiff also described how, during her second rotation through the V.A., Dr. Rive referred the complaints from Drs. Cuevas and Torres directly to Dr. Gonzalez without meeting with her to hear her side of the story. Dr. Rive admitted that he requested that Drs. Cuevas and Torres put their complaints in writing so that he could send those complaints directly to Dr. Gonzalez. The plaintiff claimed that she tried many times to meet with Dr. Rive before he did this, but he refused. She alleged that this treatment was unfair. Most importantly, she claimed that it was motivated by her refusal to respond to Dr. Rive's sexual advances. She alleged in particular that although Dr. Rive continued to make comments to her about her body during this second rotation through the V.A., she was not as "nice" to him as she had been during the first rotation. Instead of smiling at him when he made what she perceived to be sexual advances, she gave him disapproving looks or turned away.

We think that under these facts it could fairly be inferred that in forwarding the complaints, Dr. Rive was retaliating against the plaintiff for her refusal to accommodate his demands for sexual attention.[33] Dr. Rive himself conceded that he

---

33. The plaintiff claimed that other aspects of Dr. Rive's behavior—his actions in not allowing her to operate as much during her second rotation

through the V.A. as during the first, and his actions at the December 2, 1982 meeting when the plaintiff presented her petition for reconsid-

had never, in his years as director of the Program at the V.A., requested that complaints by residents about other residents be put in writing. He admitted that his typical method, instead, for handling disputes among the residents was to attempt to mediate the disputes by meeting with the parties involved. He explained his decision in the plaintiff's case as justified by the fact that the plaintiff was on probation. But this explanation raises a question of fact. It does not eliminate the inference that Dr. Rive acted out of discriminatory bias: he could have met with the plaintiff and tried to resolve the complaints without ever bringing them to the Program directors. And had this occurred, the plaintiff might not have been discharged. We cannot and should not resolve this question of Dr. Rive's intent here. Although plaintiff's evidence concerning the retaliation aspect of her *quid pro quo* harassment claim is somewhat scant, in view of the several incidents that can readily be seen as sexual advances by Dr. Rive, and in view of the overall pattern of incidents involving other defendants and residents in the Program, we do not think this claim should have been resolved on summary judgment. Although it is a close question, we conclude that the plaintiff has raised a factual issue to be resolved by the trier of fact. *See Pullman–Standard*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91.[34]

### CONCLUSION

To summarize, there is sufficient evidence in the record by way of affidavits and depositions from which the following could be found or legitimately inferred.

(1) The plaintiff could have made out a prima facie case that male residents in the Program subjected her to quid pro quo and hostile environment sexual harassment.

(2) The plaintiff could have made out a prima facie case that the complaints against her brought by male residents in the Program were infused with discriminatory bias. She established a factual basis for this bias by presenting direct evidence of it, and by showing that the accusations of misconduct contained in those complaints could be found to be either exaggerations or outright lies.

(3) The plaintiff established that, with the exception of Dr. Maldanado, it could be found that the individual defendants had actual and constructive knowledge of the plaintiff's allegations of harassment.

(4) The plaintiff presented facts from which it could be found that the failure by Drs. Blanco and Gonzalez to investigate and take reasonable measures to stop the harassment directed against her constituted gross negligence amounting to deliberate indifference. Thus, she established that they could be found liable in their individual capacities under 42 U.S.C. § 1983.

(5) The plaintiff showed that the reliance by Drs. Blanco, Gonzalez, and Santiago on complaints leveled against her that they had good reason to believe were infused with discriminatory bias, could be found to be to an act of complicity amounting to the "supervisory encouragement or condonation of or acquiescence in" the residents' discriminatory behavior. Thus, she established that they could be found liable in their individual capacities under 42 U.S.C. § 1983.

(6) Because plaintiff has presented facts from which it could be found (a) that University officials knew, or should have known, of hostile environment sexual harassment and (b) that University officials discharged plaintiff because of her sex,

eration—were also motivated by discriminatory animus. We do not address these issues because we find that the evidence presented of Dr. Rive's sending the complaints about her directly to Dr. Gonzalez are sufficient to make out a claim of quid pro quo harassment.

**34.** If the fact finder were to determine that Dr. Rive's behavior in sending the complaints to Dr. Gonzalez was motivated by discriminatory bias,

then the quid pro quo claim would not be time-barred. The plaintiff only learned that the complaints had been sent on July 1, 1982, one day less than one year before she filed suit, when she was called to a staff meeting to give her version of the accusations contained in those complaints. *See DeLeon Otero v. Rubero,* 820 F.2d 18 (1st Cir.1987).

plaintiff has established that the University could be found liable under Title IX.

(7) The plaintiff failed to show that Dr. Maldonado had any notice—either constructive or actual—of the harassment directed against her. She therefore failed to establish that Dr. Maldonado could be found liable in his individual or official capacity under 42 U.S.C. § 1983.

(8) The plaintiff's offerings established that she could make out a prima facie case that Dr. Rive, a federal employee, subjected her to quid pro quo sexual harassment. She therefore established that he could be held liable directly under the fifth amendment, pursuant to *Davis v. Passman.* We express no opinion on whether Dr. Rive is a state actor and therefore also could be liable under 42 U.S.C. § 1983.

As we stated at the outset, our review of the record has been made in the light most favorable to the plaintiff, the party against whom summary judgment issued. We intimate no view as to how the disputed facts should be decided—that is for the fact finder.

The defendants sued in their individual capacities, are of course, free to raise the qualified immunity defense at trial.

In accordance with our customary practice in analogous situations, and without any reflection on the judge, we think it appropriate under all the circumstances that the case be reassigned to a different trier on remand. *See Maldonado Santiago v. Velazquez Garcia,* 821 F.2d 822, 832–33 (1st Cir.1987) (noting factors to be considered in reassigning case on remand.)

*The orders of June 12, 1986, and September 16, 1987, granting summary judgment in favor of all of the defendants except for Dr. Maldonado are reversed. The case is remanded for a trial on the merits. Costs on appeal are awarded to the plaintiff.*