**Ricardo R. Avila MUÑOZ, et al., Plaintiff,**

v.

**Pedro TOLEDO DÁVILA, Luis Sotomayor Medina, Defendant.**

Civil No. 96–1525 (JP).

United States District Court, D. Puerto Rico.

Feb. 5, 1997.

Héctor M. Alvarado Tizol, Carolina, P.R., for Plaintiff.

Lynette Algarín–Johnson, Bamily López, Federal Litigation Division, Department of Justice, San Juan, P.R., for Defendant.

### OPINION AND ORDER

PIERAS, District Judge.

## I. INTRODUCTION AND BACKGROUND

The Court has before it codefendant Toledo Dávila's motion for a judgment as a matter of law made under Rule 50(a) of the Federal Rules of Civil Procedure. The Court finds that the motion is well taken and is hereby **GRANTED.**

The plaintiffs, Ricardo Avila Muñoz and his mother, Dalia Iris Muñoz, have brought this action under 42 U.S.C. § 1983, alleging that the defendants violated Avila's constitutional rights. Specifically, the plaintiffs argue that Avila's right to be free from excessive force was violated when police officer Luis Sotomayor beat him with a pool cue and a pistol at the El Criollito bar in Guaynabo, Puerto Rico, on July 15, 1995.

The plaintiffs initially sued both Sotomayor and a group of several governmental defendants, including Governor Pedro Rosselló, Justice Secretary Pedro Pierluisi, the Commonwealth of Puerto Rico itself, and Police Superintendent Pedro Toledo Dávila. The claims against Governor Rosselló and Secretary Pierluisi were dismissed for failure to state a claim upon which relief could be granted. The case against the Commonwealth was dismissed on Eleventh Amendment grounds. Although a witness in this trial, Sotomayor has never made an appearance and is presently in default. The case against codefendant Toledo Dávila went to trial, and the plaintiffs have concluded their case-in-chief.

Toledo Dávila has moved for judgment under Rule 50(a), arguing that the plaintiffs have not presented evidence from which a reasonable jury could find Toledo Dávila liable under § 1983. Specifically, the codefendant argues that the plaintiffs have not provided any evidence from which a reasonable jury could determine that Toledo Dávila knew or should have known that Luis Sotomayor presented a danger to the constitutional rights of any individuals. Therefore, codefendant argues, no reasonable jury could find that his failure to identify Sotomayor as a threat to protected personal liberties, from among approximately 15,000 officers under his supervision, constituted deliberate, reckless, or callous disregard or gross negligence, given that during Toledo Dávila's tenure no complaints were filed against Sotomayor that would have brought Sotomayor's record to Toledo Dávila's attention.

## II. STANDARD FOR JUDGMENT AS A MATTER OF LAW

The standard for granting a judgment as a matter of law under Rule 50(a) has been spelled out time and again by the United States Circuit Court of Appeals for the First Circuit:

> "[The Court must consider] the evidence and the inferences reasonably drawn therefrom in the light most favorable to the non-movant. The Court must not consider the credibility of witnesses, resolve

conflicts in testimony, or evaluate the weight of the evidence. A verdict may be directed only if the evidence, viewed from this perspective, would not permit a reasonable jury to find in favor of the plaintiff on any permissible claim or theory."

*Andrade v. Jamestown Housing Authority,* 82 F.3d 1179, 1186 (1st Cir.1996) (internal quotations and citations omitted).

## III. FACTS

This action stems from events that transpired at the El Criollito bar in Guaynabo, Puerto Rico, on the morning of July 15, 1995. We briefly relate that incident based on the testimony of coplaintiff Avila. The coplaintiff went to the El Criollito bar with some friends, where he got into a heated exchange with another patron of the bar. Codefendant Luis Sotomayor, who was a police officer in the Puerto Rico Police Department at that time, joined the fray. Eventually, Avila was beaten severely at the hands of Sotomayor. Sotomayor has testified that he was acting as a police officer during the incident at the El Criollito, that he identified himself as such, and that he displayed his badge. Avila testified that, as a result of the beating, he sustained fractured facial bones, several lacerations, pain and suffering, and emotional injuries. He was hospitalized immediately following the incident, and underwent reconstructive surgery two weeks afterward. Coplaintiff Dalia Iris Muñoz testified that she endured emotional pain and suffering as a result of her son's injuries.

The relevant inquiry now before the Court does not concern the events at the El Criollito. Instead, the issue we now face regards codefendant Toledo Dávila's involvement in this action, and whether he was on actual or constructive notice that Sotomayor's actions at the El Criollito were probable, such that Toledo Dávila's failure to control Sotomayor constituted deliberate indifference to constitutionally protected individual rights. The only evidence the plaintiffs presented concerning that issue was the testimony of Sotomayor himself.

Viewed in the light most favorable to the plaintiffs, the facts relevant to this issue are as follows. Luis Sotomayor joined the police department in July 1983. As a result of the incident at the El Criollito, Sotomayor was dismissed from the police force in 1996. According to Sotomayor's testimony, eight complaints (other than the one stemming from the episode at the El Criollito) were filed against him during the course of his fourteen years on the force. According to his testimony, these complaints were levelled as follows:

1. In 1987 or 1988, a woman who did not agree with the propriety of a traffic ticket given to her by Sotomayor filed a complaint. After further investigation, the ticket was upheld and the complaint dismissed.

2. In 1988, another officer filed a complaint against Sotomayor alleging that Sotomayor assaulted a prisoner, who was in custody because he had robbed and threatened to kill Sotomayor. After investigation, it was determined that this complaint was unfounded and was dismissed.

3. In 1989, Sotomayor was cited for failing to file a report regarding a breathalyzer test. That complaint was also dismissed.

4. In 1990, a complaint was filed alleging that Sotomayor failed to request sick leave according to proper administrative procedures.

5/6. In 1990 or 1991, two complaints were levelled by an attorney stemming from another officer's intervention, at which Sotomayor was present. The attorney threatened to sue the intervening officer, who in turn filed a complaint against Sotomayor listing him as a witness. The notice of intent to sue was also placed in Sotomayor's record, because he was named as a witness.

7. In 1991, a complaint was filed against Sotomayor for failing to follow administrative procedures with respect to a speeding ticket. After a hearing, the ticket was found to be in order and the complaint was dismissed.

8. In 1991, a complaint was filed against Sotomayor for not following proper ad-

ministrative procedures with respect to sick leave. The complaint was dismissed.

No further complaints were filed against Sotomayor until the one resulting from the events at the El Criollito.

Codefendant Toledo Dávila became the Superintendent of the Puerto Rico Police Department in 1993. He has responsibility for approximately 15,000 police officers.[1] The plaintiffs introduced no evidence that any complaints were filed against Sotomayor during Toledo Dávila's tenure as Police Superintendent, other than the one stemming from the incident at the El Criollito. It was in response to that complaint that Toledo Dávila dismissed Sotomayor from the force.

## IV. 42 U.S.C. § 1983

The plaintiffs have brought this action against the Superintendent of Police under § 1983 based on a theory of supervisory liability. The First Circuit has clearly delineated the law on supervisory liability under § 1983. "Supervisory liability may not be predicated upon a theory of *respondeat superior.*" *Sánchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (citing *Gutiérrez–Rodríguez v. Cartagena,* 882 F.2d 553, 562 (1st Cir.1989)). The supervisor must be sued in his individual capacity "for his own acts or omissions." *Id.* (citing *Figueroa v. Aponte–Roque,* 864 F.2d 947, 953 (1st Cir.1989)). Moreover, supervisory liability under § 1983 cannot be premised on mere negligence. *Febus–Rodríguez v. Betancourt–Lebrón,* 14 F.3d 87, 92 (1st Cir.1994). "Absent participation in the challenged conduct, a supervisor can be held liable only if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence of the supervisor amounting to deliberate indifference." *Hegarty v. Somerset County,* 53 F.3d 1367, 1379 (1st Cir.1995) (internal quo-

tations and ellipses omitted) (citing *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (1st Cir.1988)). The First Circuit has more recently added that "indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under § 1983." *Sánchez,* 101 F.3d at 227. Deliberate, reckless, or callous "indifference will be found only if it would be manifest to any reasonable official that his conduct was *very likely* to violate an individual's constitutional rights." *Hegarty,* 53 F.3d at 1380 (emphasis added); *Febus,* 14 F.3d at 92. The 'affirmative link' requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation. *Hegarty,* 53 F.3d at 1380.

## V. ANALYSIS

Looking at the plaintiffs' claim, the Court must now review the testimony presented by the plaintiffs during their case-in-chief, drawing all reasonable inferences therefrom, in the light most favorable to the plaintiffs. The plaintiffs have never clearly set forth and explicated their theory/theories in this case, but the Court can glean from the arguments made by plaintiffs' counsel in response to the motion at bar that the plaintiffs seek to utilize the same theory as the one employed successfully by the plaintiff in *Gutiérrez–Rodríguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989). In that case, the First Circuit upheld a jury verdict against defendant Cartagena, then Superintendent of the Puerto Rico Police Department, for violating § 1983 in the execution of his duties as police superintendent. In affirming a jury verdict for the plaintiff, the *Gutiérrez* court held that the jury could have found that Cartagena's "failure to identify and take remedial action concerning [police officer Pedro] Soto and his employment of a disciplinary system that was grossly deficient in a number of significant areas made it highly likely that the police officers under his command would engage in

1. The Court takes judicial notice of both the fact that Toledo Dávila took office as the Superintendent in 1993 and that he supervises approximately 15,000 officers. Although never introduced as evidence, these facts were presented without ob-

jection during oral argument on the codefendant's motion under Rule 50(a). They are facts generally known within Puerto Rico. *See* Fed. R.Evid. 201(b).

conduct that would deprive the citizens of Puerto Rico of their constitutional rights."

The plaintiffs in this case have likewise attempted to stress that codefendant Toledo Dávila either knew or should have known that Luis Sotomayor presented a palpable danger to the constitutional rights of members of the public. They have also argued, most recently in response to the motion at bar, that codefendant Toledo Dávila's failure to implement a mechanism for identifying officers that presented a threat to protected individual liberties constitutes reckless, callous, or deliberate indifference toward those rights. The Court can synthesize these arguments into one theory: codefendant Toledo Dávila was on notice, either actual or constructive, that Luis Sotomayor had a propensity to violence that made employing him as a police officer likely to result in the deprivation of an individual's constitutional rights and Toledo Dávila deliberately disregarded that danger.

If the plaintiffs hoped to employ this theory with success, they carried the burden of showing that Toledo Dávila was on notice that Sotomayor was dangerous, so that Toledo Dávila's failure to supervise Sotomayor constituted a deliberate disregard for the constitutional rights of the citizens of Puerto Rico. As the United States Circuit Court of Appeals for the First Circuit has stated:

> "[a]n important factor in determining whether a supervisor is liable to the extent he has encouraged, condoned, acquiesced, or been deliberately indifferent to the behavior of a subordinate, is whether the official was put on notice of behavior which was likely to result in the violation of the constitutional rights of citizens."

*Febus,* 14 F.3d at 93 (citing *Lipsett,* 864 F.2d at 902). Notice is required because:

> "one cannot make a 'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires taking affirmative steps. Once an official is so notified, either actually or constructively, it is reasonable to infer that the failure to take such steps as well as the actual taking of them constitutes a choice 'from among various alternatives.' ...

> One obvious alternative is to do something to make the violations stop."

*Id.* (quoting *Lipsett,* 864 F.2d at 902). Unless codefendant Toledo–Dávila was on notice that Luis Sotomayor presented a danger to the public, no reasonable jury could find that his failure to control Sotomayor amounts to reckless indifference.

■ No reasonable jury could find for the plaintiffs under this theory based on the evidence they have produced during their case-in-chief. As we have noted, Sotomayor's testimony regarding the eight complaints forms the only basis from which a jury could decide whether codefendant Toledo Dávila was on actual or constructive notice that Sotomayor might act as he did at the El Criollito on July 15, 1995. Although the plaintiffs have not even attempted to put on any evidence to prove that Toledo Dávila had actual notice of a propensity toward violence on the part of Luis Sotomayor, that is not required, as a showing of constructive notice would suffice.

The jury could find that Toledo Dávila was on constructive notice either if he should have known that, based on the information before him, Luis Sotomayor was likely to violate someone's constitutional rights or if he would have known had he not failed, out of deliberate indifference or gross negligence, to employ a proper disciplinary system. *Gutiérrez,* 882 F.2d at 566. The plaintiffs have offered no testimony or evidence of any kind from which a jury could determine what information codefendant Toledo Dávila actually had before him. Specifically, the plaintiffs have not provided any evidence from which a jury could find that codefendant Toledo Dávila actually ever saw the complaints levelled against Luis Sotomayor. Indeed, all of the complaints were made between 1988 and 1991, long before codefendant Toledo Dávila became the superintendent in 1993. Like the plaintiffs in the case at bar, the plaintiffs in both *Gutiérrez* and *Febus* sued the superintendent of police based on allegations of brutality on the part of police officers under their control. In each of those cases, the plaintiffs made the same arguments that the plaintiffs in the case at bar have propounded, that

citizen complaints had put the superintendents on notice of the offending police officer's propensity for such acts. However, the defendant police superintendents in both *Gutiérrez* and *Febus* were superintendents at the time the proffered complaints had been made against their subordinate officers. From that fact, the plaintiffs in those cases were able to show that the defendant superintendents actually saw the complaints filed during their tenure, because the superintendents' duties include reviewing all complaints made against officers. *See Febus,* 14 F.3d at 93; *Gutiérrez,* 882 F.2d at 564. In fact, the plaintiff in *Gutiérrez* put on evidence that then superintendent Cartagena personally signed letters dismissing twelve of the thirteen complaints that had been made against the offending officer during the three years prior to the offending conduct. Here, however, because the codefendant was not the superintendent at the time the complaints were filed, and because the plaintiffs have introduced no other evidence on the matter, no reasonable jury could find that codefendant Toledo Dávila actually saw the complaints or knew of their existence.

Instead, the plaintiffs rely on the hypothesis that Toledo Dávila's grossly negligent failure to implement a proper disciplinary system rendered him unable to identify officers that presented a palpable threat of violence. The plaintiffs have not proffered any direct evidence from which a reasonable jury could make the finding they seek. None of the plaintiffs' witnesses has testified and none of their documentary evidence has shown that codefendant Toledo Dávila did in fact fail to install such a system, or that such a system is not presently in place, or even that such a system is feasible. Nothing whatsoever directly regarding any supervision technique employed by the codefendant was brought out in the plaintiffs' case.

However, because this case is before the Court on codefendant Avila's motion for judgment as a matter of law, we must go beyond the direct evidence and draw all reasonable inferences from that evidence. As we have repeatedly noted, the only evidence produced by the plaintiffs from which the necessary inferences could be drawn is Soto-

mayor's testimony regarding the eight complaints. From that testimony, the plaintiffs argue that a jury could infer, based on the substance of those complaints, that codefendant Toledo Dávila failed to implement a proper system for identifying officers likely to violate individual rights. They assert that the information contained in the complaints was of such a nature that any proper system of supervision would have brought those complaints to the attention of the police superintendent, even one appointed after the last complaint had been made, and therefore codefendant Toledo Dávila was on constructive notice that Sotomayor was a danger to individual liberties. This tenuous inference, however, is not supported by Sotomayor's testimony regarding the complaints, and no reasonable jury could draw it therefrom.

The plaintiffs have not provided any evidence as to the mechanics of the type of system they would have had Toledo Dávila install. Whatever that mechanism was, under the plaintiffs' theory, it would have had to alert Toledo Dávila of Sotomayor's file. Given that Toledo Dávila was responsible for approximately 15,000 police officers, the plaintiffs cannot (and do not) seriously contend that a jury could find that Toledo Dávila would have acted with reckless disregard if he failed to review the file of each and every officer. Therefore, plaintiffs' argument would require some method by which a police officer with Sotomayor's record would be singled out for review.

One problem with this argument lies in the fact that it presupposes that Toledo Dávila's predecessors were grossly negligent in failing to deal with Sotomayor, either because they had direct knowledge of the complaints against Sotomayor or because they, like Toledo Dávila, failed to implement a system that brought to their attention a propensity toward violence in Sotomayor that made it likely he would violate someone's constitutional rights. Without that presupposition, Toledo Dávila could simply have relied on his predecessors' decisions, so that Toledo Dávila could legitimately determine that officers not on probation or suspension posed no threat. Without some understanding that a problem existed of which Toledo Dávila knew, no jury

could find that Toledo Dávila acted with reckless indifference in failing to address that unknown problem. The plaintiffs have given no evidence from which a jury could determine that Toledo Dávila's predecessors utilized grossly deficient standards in supervising their police officers or that, even if they were incompetent in that respect, Toledo Dávila knew of their incompetence. In other words, from the evidence, no jury could find that Toledo Dávila even knew ·of the need for such a system.

A second problem lies in the plaintiffs' failure to bring to light any comparative statistics from which the jury could determine that Sotomayor's record was so bad relative to most of the police officers in the Puerto Rico Police Department that any system that Toledo Dávila activated would have identified Sotomayor as a dangerous officer. As we have noted, no reasonable jury could consider as reckless disregard the failure of a newly appointed police superintendent to review the file of every officer under his supervision. Therefore, Sotomayor's record must have been bad enough to have placed Sotomayor in a category small enough to have made review practical. But the plaintiffs have proffered no evidence and no expert testimony as to the average Puerto Rico Police officer's record from which a jury could have made that determination. From the evidence, then, the jury could not know whether Luis Sotomayor had an exemplary record, an average record, or a terrible record.

Perhaps the most obvious flaw with the plaintiffs' argument is that it relies on the notion that Sotomayor's record was sufficiently awful to constitute notice of violent tendencies making Sotomayor likely to assault citizens. This fact is important to the plaintiffs' case for two reasons. First, under their theory, Toledo Dávila's failure to install a system whereby officers with records of egregious infractions would be identified requires that Sotomayor's record was suffi-

ciently bad to stand out from among the records of most officers. Showing this would entail a showing that his record was relatively heinous.[2] Second, plaintiffs' theory also relies on the notion that had Sotomayor's record come before Toledo Dávila, it was appalling enough to put Toledo Dávila on notice that Sotomayor was the type of police officer likely to act as he did at the El Criollito, thus rendering Toledo Dávila's failure to supervise Sotomayor recklessly indifferent. The Court holds that, even if the plaintiffs had not failed to show any evidence that Toledo Dávila did or should have seen Sotomayor's records, no reasonable jury could hold that the eight complaints aimed at Sotomayor should have put Toledo Dávila on notice that Sotomayor was likely to violate anyone's constitutional rights. Only one of the complaints could even seriously raise a question regarding Luis Sotomayor's propensity for violence. Indeed, five of the complaints deal with traffic tickets and questionable sick leave. All of these were dismissed. Two others stemmed from an incident in which another officer pulled his service revolver on an attorney during an intervention at which Luis Sotomayor was present. Sotomayor testified that when the attorney threatened to sue, the other officer implicated Sotomayor as a witness. Sotomayor had not displayed any aggression toward the complainant, but was merely a witness. Both of the complaints arising from this incident were dismissed. The complaint that concerns the Court most was made by another police officer in 1988, seven years before the incident at the El Criollito and five years before Toledo Dávila even took his present office. That complaint alleged that Luis Sotomayor assaulted a prisoner. However, after an investigation of the incident, the complaint was dismissed and Luis Sotomayor was given an "orientation." The plaintiffs introduced no evidence other than Sotomayor's testimony regarding the dismissed complaint itself that would inform the jury of the

---

2. Because the plaintiffs have proffered no evidence regarding the average or normal police officer's record the jury would be forced to observe Luis Sotomayor's record standing alone. While we consider the evidence regarding the average police officer's record important, we also realize that Sotomayor's record could be so full of egregious conduct that a reasonable jury could find that a superintendent's failure to implement a system that would identify that record amounts to gross negligence or deliberate indifference.

extent to which Luis Sotomayor had acted violently, if at all, during the incident for which the complaint was made.[3] Furthermore, the complaint was made in 1988, five years before codefendant Toledo Dávila became the superintendent of police and seven years before the incident at the El Criollito occurred. No reasonable jury could find, based on the plaintiffs' evidence, that Toledo Dávila should have implemented a system whereby old, dismissed complaints like those in Sotomayor's file would be brought to his attention. Moreover, even if the plaintiffs had proffered any evidence that would have allowed a jury to find that Sotomayor's complaint should have come before Toledo Dávila, no reasonable jury could find that the substance of those complaints should have put Superintendent Toledo Dávila on notice that the officer against whom they were made constituted a palpable risk to the public. In order to make that finding, a jury would have to find that Toledo Dávila should have determined at some point between 1993 and 1995 that eight dismissed complaints, the most recent of which was made in 1991 and only one of which, made in 1988, even hinted at violent tendencies, indicated a propensity for violence. Moreover, the jury would further have to find that Toledo Dávila should have overturned the determinations made by his predecessors and subjected Sotomayor to some punishment or supervision based on those old complaints. No reasonable jury could have reached such a conclusion. Aside from the eight complaints, the plaintiffs have not presented any evidence from which a jury could find that the codefendant Toledo Dávila had actual or constructive notice that Luis Sotomayor was likely to use excessive force. Therefore, the Court holds that no reasonable jury could find that codefendant Toledo Dávila had such notice.

The plaintiffs have relied in large measure on *Gutiérrez*, in which the First Circuit came to a different conclusion. But the facts in that case are easily distinguishable on several grounds from those presented by the plaintiffs in this case. However, because the plaintiffs in the case at bar have employed the same theory as the plaintiff in *Gutiérrez*, the Court feels compelled to explain the distinctions. In *Gutiérrez*, a group of four plainclothes narcotics officers, commanded by one Pedro Soto, came across the plaintiff's car on a lover's lane, where the plaintiff was parked with his girlfriend. The officers, deciding to further investigate, parked their car and approached the plaintiff's car on foot with weapons drawn. Upon seeing four non-uniformed men approaching his car on a rural road with weapons drawn, the plaintiff anticipated foul play and attempted to speed away, but one of the officers shot him in the spine, leaving the plaintiff paralyzed for life. He sued then police superintendent Desiderio Cartagena among others. Based on the evidence produced in that case, the United States Court of Appeals for the First Circuit upheld a jury verdict against the superintendent of police, holding that the jury could reasonably have concluded that Cartagena was liable under § 1983 because he had been or should have been put on notice that the offending officer was predisposed to the offensive conduct. The most important distinction between *Gutiérrez* and the case at bar is that the plaintiffs in *Gutiérrez* showed that Cartagena had the information that did or should have put him on notice of officer Soto's behavioral problem. The defendant in *Gutiérrez* had been the superintendent at the time officer Soto had been charged with numerous citizen complaints. During the three years leading up to the incident, Soto had been the subject of at least 13 citizen complaints, of which at least one involved founded allegations of severely disturbing and violent behavior. Five of these had been filed during the year of the incident and three during the six months immediately preceding the incident. Cartagena had personally signed letters dismissing the charges in twelve of the thirteen cases and thus had actual knowledge of Soto's record. Additionally, the plaintiff in *Gutiérrez* introduced expert testimony that officer Soto's record was abysmal and that it should have given rise to

---

3. Indeed, Sotomayor explained that he had not assaulted the prisoner, but that two other officers, who wished to see Sotomayor avenge the beating he took at the prisoner's hands, pushed the prisoner onto Sotomayor. He explained that he had not taken advantage of the opportunity given him by his fellow officers.

serious concern on the part of any supervisor who saw it. One expert testified that the shear number of complaints made against Soto should have served as a red flag that Soto presented a risk. The expert's testimony was corroborated by the testimony of both the police superintendent's successor and the Director of the Administrative Investigations Division for the Area of San Juan, both of whom stated that this number of complaints was "quite unusual." The plaintiff in *Gutiérrez* also put forth concrete evidence that Soto's record definitively showed a tendency toward violence in contravention of citizens' rights. During the same year of the incident on lover's lane, Soto had been suspended for five days for pointing a gun at a civilian doctor while those under his command beat that doctor. Cartagena had affirmed the suspension personally.

In addition to putting on both evidence that Cartagena had the information that should have put him on notice and evidence that Soto's record actually showed a disturbing propensity for violence, the plaintiff in *Gutiérrez* also put into evidence that Cartagena "emphatically refused to consider an officer's past history of complaints when reviewing that officer's conduct ... [i]ndeed, the files which were brought to him for disposition did not even include the officer's prior history of complaints." Cartagena's decision not to consider past conduct when evaluating complaints made it very difficult for him to identify patterns of misconduct. From this, the jury in *Gutiérrez* had the necessary information from which to decide that Cartagena's disciplinary system was deficient to the extent that it amounted to deliberate, reckless, or callous indifference or gross negligence.

As we have noted, the plaintiffs in the case at bar have proffered no evidence from which a jury could find that codefendant Toledo Dávila displayed the same type of indifference displayed by Cartagena. The last of the eight complaints in Sotomayor's record was filed in 1991, two years before Toledo Dávila became Superintendent in 1993. Thus, the jury could not have determined that Toledo Dávila had any information regarding Luis Sotomayor. The plaintiffs have also not produced any evidence regarding Toledo Dávila's present disciplinary system. They have likewise failed to provide the jury with any measure of Sotomayor's record relative to the average police officer. Thus the jury could not have determined whether Toledo Dávila presently employs an effective disciplinary system or even whether an effective disciplinary system would have even identified Sotomayor as an unusually dangerous officer. Finally, the purely objective evidence of Sotomayor's record (although irrelevant given the plaintiffs' other evidentiary shortcomings) is simply not of the nature to indicate that Sotomayor had a violent nature or that the events at the El Criollito were likely to occur. No reasonable jury could find that, even if Toledo Dávila had Sotomayor's record before him, that it would have been gross negligence or reckless indifference for him not to overturn the determinations of prior superintendents and dismiss Sotomayor or subject him to some other preventative treatment.

■ A second theory that the plaintiffs appear to have been driving at during their case in chief asserts that the hiring/screening policies used by codefendant Toledo Dávila were so grossly negligent as to constitute deliberate, callous, or reckless indifference. Remembering that we must explore all valid claims and look at all reasonable evidentiary inferences, we derive this theory from the plaintiffs' questioning of Luis Sotomayor regarding his high school grades, his initial failure of the police academy entrance exam, and his failures on two sergeants' exams. However, because codefendant Toledo Dávila was not the police superintendent when Luis Sotomayor was hired, and because the plaintiffs have proffered no evidence regarding hiring policies implemented by the codefendant, no reasonable jury could find, based on the plaintiffs' evidence, that the codefendant's hiring/screening policies are in any way deficient. It would also be unreasonable to expect Toledo Dávila to dismiss all police officers hired prior to the implementation of any new hiring practices and standards sim-

ply because they were hired using the standards of previous superintendents.

## VI. CONCLUSION

In sum, considering all of the plaintiffs' evidence and all inferences reasonably drawn therefrom in the light most favorable to the plaintiffs, the Court holds that no reasonable jury could find that the plaintiffs have met their burden for holding codefendant Toledo Dávila liable under 42 U.S.C. § 1983. Therefore, the Court **GRANTS** codefendant Toledo Dávila's motion for judgment as a matter of law. Judgment shall be entered accordingly.

The Court will close this Opinion and Order with the following final remark. It cannot be doubted that good laws and jurisprudence in the relatively nascent field of civil rights, particularly as applied to sex, race, national origin, and age discrimination, are beneficial and important. However, the concept of civil rights violations as a cause of action, no matter how popular, cannot be applied to all situations. Judges must exercise their power to contain the use of legislatively created constitutional causes of action within reasonable boundaries. Otherwise, the pendulum will inexorably move too far toward permissiveness, turning otherwise useful legislation into a tool for abuse, and eventually forcing the legislature to undue the damage wrought by overly liberal application. Whenever judges allow unfettered use of excellent legislation to spoil that legislation and thereby force legislative intervention and constraint, we must fear that the original value of the law will be lost.

IT IS SO ORDERED.